MILLER v. SIMONDS, *Appellant.*

**Conveyance by Child to Parent**: UNDUE INFLUENCE: BURDEN OF
PROOF. A voluntary conveyance by a child to its parent while still
under the parental control, is presumptively void. The burden is
upon the parent to show, in the clearest and most satisfactory man-
ner, that it is in every particular worthy of receiving the sanction of
a court of equity. A voluntary conveyance made by a daughter to
her father before marriage was in this case assailed by her and her
husband as having been obtained through undue influence. She
testified that her father used no improper or undue influence of any
nature to induce her to sign the deed ; that he never even spoke to
her on the subject until after the deed was prepared and she was
about to execute it; that her brother, who joined in the deed, con-
veying his equal interest in the same property, first suggested the
propriety of the step, and that she readily assented. She was at
the time three years and three months past her majority. She was,
however, living in her father's house. The deed conveyed an estate
for her father's life in all the property she had. It was executed
when she was on the eve of marriage, improvidently, without time
or opportunity for proper reflection, and without any independent
advice. *Held,* that it must be set aside.

*Appeal from St. Louis Court of Appeals.*

AFFIRMED.

This was an action brought by Silas W. Miller and
Margaret J. Miller, his wife, against Jacob W. Simonds, to
have a deed executed by the said Margaret in favor of de-
fendant, before her intermarriage with said Silas, set
aside. Defendant was the father and had been the guar-
dian of said Margaret. The petition alleged that by reason
of this double relation, the defendant held and exercised
great and controlling influence over the mind and actions
of the said plaintiff from the time of his appointment as
her guardian, and before, until her marriage with the
plaintiff, Miller; and until then her said guardian held pos-
session of and exercised sole and exclusive control over
her property, and managed her business affairs in connec-
tion therewith in his own way, without any knowledge or

interference therewith on her part, she reposing implicit and child-like confidence and trust in him as her parent and guardian in relation thereto ; that the conveyance complained of, was not the free and voluntary act of said Margaret, but was obtained from her by the undue influence of her father and guardian, aided and assisted by her brother, Wm. T. Simonds; that she was then engaged to marry said Silas W. Miller, which fact her father and brother well knew, and to which marriage her father, the defendant was strongly opposed ; and her father, the defendant, being unable to break said engagement, combined and colluded with her said brother to procure by their undue influence the execution of said deed, with the fraudulent purpose and intent of depriving her and the said Silas, when their marriage should be consummated, of the possession and enjoyment of said property ; and that said Wm. T. Simonds acted under the direction and in connivance with the defendant in persuading her to make said deed ; that by their undue influence and persuasion, they induced her to make said deed without any consideration whatever therefor ; that said conveyance, obtained as aforesaid, was in fraud of the rights of the plaintiff, Margaret, and of the marital rights of said Silas, and is inequitable and unjust if suffered to stand ; and that the procurement or acceptance thereof by said defendant is in violation of the delicate relations of trust and confidence growing out of the relationship of parent and child, guardian and ward ; wherefore said deed is fraudulent and void, and should be held for naught.

Defendant answered, denying the right of plaintiffs to any relief. The deed complained of was a conveyance of the half interest of the plaintiff, Margaret, in a tract of land in St. Charles county.

On the part of the plaintiffs, the evidence was as follows :

A letter dated St. Charles, May 12th, 1874, from defendant to his son, William :

*Dear Son:* I seat myself to write a few lines to let you know that I am well at this time I got your letter last week. I was glad to hear that you wer wel I am in great hopes you will learn much this summer It has rained the whole spring I have not planted a hill of corn yet if it don't rain to-night I want to plant to-morrow but it looks like it will rain any time I have got that new ground in Willie my son I have had a heap of trowble since I saw you, all cawsed by your sister and Milers she is there to-night her and Silas is going to get married so she says I told her I did not care, I took her to town and bought her dressing when it is to be I don't know I am willing to treat them well, I have not sold my wheat yet when I will don't know Having nothing more to writ I will close for this time. Remaining yours as ever

J. W. SIMONDS.

Margaret J. Miller, one of the plaintiffs, testified: I lived at J. W. Simonds, my father, in May, 1874; I was twenty-one years of age in May, 1874; up to that time I resided at my father's house; William is my only brother; mother is dead; I was two years old when she died; my father married a second time; my stepmother is dead also; I was eleven or twelve years old when she died; he has not since married; in May, 1874, there was no woman on the place of my father, except a colored woman; my father, myself and my brother were then the only members of my father's family; there had been no white woman living in my father's family since my stepmother died; my father managed and controlled my real estate; I relied on him in its management; I had no other property except the land conveyed by the deed; I was always under the impression that my father had other property besides this; I never thought much about it; my brother came home on Saturday and mentioned it to me; he was the first and only one ever mentioned it to me up to that time; I never thought of it before; that was on Saturday; on Monday I made the deed; he spoke of it, and said he thought it would be

right; we came in on Monday and made the deed; I never spoke to any one about it from the time he spoke on Saturday until Monday; a few minutes before I signed it, pa spoke to me about it; this was on the porch or hall of Judge King's office; father then told me he had plenty, and I need not sign it unless I wished; this was just before I signed it; my father went in with me to sign it; Wm. T. Simonds was there when I signed it, also; he ordered the writing; I don't have any recollection of saying anything about it; I suppose my brother selected the attorney to write the deed; he took me there; I didn't comprehend all I was doing in signing that deed; I never knew what I was doing; on Saturday my brother talked to me and told me about the property more than I ever heard before, and that we ought to convey it to pa for his lifetime, because he was old, and he thought it best for us to do it, and I very readily gave my consent without thinking anything about it; my father had only on one occasion spoken to me about it, a short time before, and told me he heard I was going to turn him out of house and home; I asked him who told him, and wanted to know how he thought I could possibly do such a thing, even if I desired; he refused to tell me who told him, and said he never would tell me who told him; there was very little more said; I was engaged to Mr. Miller at that time; my father knew that Mr. Miller was coming to see me then; I do not remember positively whether he knew it then, (the engagement,) but I think he did; this conversation was shortly before the deed was made; my father was opposed to my marriage with Mr. Miller; my brother came home from St. Louis on Saturday evening, a little before sundown; the Saturday before the deed was made; he spoke to me soon after he came home about making the deed; said to me, father had raised us and clothed us, that we ought to have it fixed so that father could enjoy it in his old age; in most things I had followed the directions of my brother; about this deed and the property I then followed his advice; before, I

didn't think or know much about it; my brother only spoke to me once about it that night; my brother was not at home on Sunday, and came home Sunday night; I was at home all day Sunday and Sunday night; I talked to no one else about it, (the deed;) we came in town early Monday; I wasn't well at the time; was sick all day Monday, when I signed the deed; was sick when I left home that morning; I don't remember anything definite about it that day; I was sick all day; would never have thought of making the deed had he not mentioned it; I would not have done it of my own accord; I thought the land was through my mother, but, in fact, I never thought anything about it; my brother never said much about my contemplated marriage with Silas Miller; I didn't think he was exactly willing, but he never said much about it; after I signed the deed my brother went back to St. Louis; I and my father and my brother came into town together in the wagon; we got in between ten and eleven o'clock and went straight to King's office; I last saw my brother that day at King's office; we did not remain all the time at King's office; it was shortly after dinner my brother left; we took dinner at Ruenzi's hotel at about twelve o'clock; he went directly from the office after the deed was signed for St. Louis; my brother was attending the medical college in St. Louis; the deed was executed May 18th, 1874, and I was married June 11th, 1874; I received no money from my father for the deed; my brother is nearly two years older than myself; I think my brother had been going to college two terms then; was when I married; my brother lives at home at his father's and part of the time at his office in Potterville; my brother is single. *Cross-examined:* I went to Pitman's school two terms and a half; I quit school, I think, about four years ago; I stayed with my father until I married; I boarded at Pitman's when at school; at the time I signed the deed I knew I had an interest in the property, but didn't know how much; there was no conversation between myself and father between Sat-

43—72

urday and Monday when the deed was made; it was not mentioned on the way into town; I was then twenty-one years old; I was not insane or crazy at the time I signed it; I understood it was a deed, but did not realize what it really was; I didn't comprehend it; I understood the language of course; Mr. King, my brother, Mr. McDearmon and my father were present; my father, on the porch, told me he did not need the property; that it would be a burden to him; and he would get along better without it; I don't think it was as much as a month from the time father spoke to me about turning him out of house and home till the deed was made; I gave father a receipt that day, but what I thought was, that is, was for $70; I think McDearmon drew up the receipt; I have no recollection of its being explained to me, (the receipt;) it was spoken of the same evening (Saturday) about the money coming to me, on which the deed was first spoken of; I knew, I had been told I had property, but as to the quantity I did not know; I never thought seriously about the deed after I executed it until after I married, that is, not much or seriously; I thought about it on my own reflection; I didn't see where I had done wrong until after I had married; I thought about it from my own reasoning and not upon suggestions from others; I had time to think about it as time passed; I think I was not as capable of judging for myself when I signed the deed as I was afterward; Silas Miller did not first suggest to me the impropriety of my signing the deed; I first thought of it myself; it has been spoken of by many since; I mentioned it to my husband, and thought the matter would be repaired; my husband thought not; pa had told me on one occasion I could have it back again; just before I was married he complained to me of some bills; I told him I had to depend on him for everything, and he said he would give it back whenever I wanted it; my father never used any improper or undue influence of any nature to induce me to sign that deed; we had but little help at the marriage; Mr. Miller's family

were there; I informed my father of my contemplated marriage; I don't remember when; I think it was before I signed the deed; I am related by blood to my husband; my father opposed it; my husband and I are second cousins; while I was at Pitman's, brother was at home; afterward he went to Fulton to school; shortly before we married, I told brother we were going to marry; I did not advise with my father and brother before I became engaged to Mr. Miller; during several years before I was married, brother and I were apart most of the time; when we talked about making the deed (Saturday) my brother knew of the marriage contemplated; we might not have talked of it the day we first talked of the deed, but talked of it all the way coming into town; I don't think father raised any objections to receiving the deed when presented to him; I think my husband has had great respect for my father, but he has had cause not to feel kind toward him; I do not think they speak. *Re-examined:* Father, brother and I took dinner together; father told me about a month before the marriage he would give me back the deed; in the winter after I was married I asked him for the deed back; I reminded him of his promise; he said he could not do it; I asked him once or twice again after that for the deed; he said he never wanted me to mention it again, that he couldn't do it; when I signed the deed I knew my father was opposed to my marriage with Mr. Miller; I don't know what motive I had in signing the deed; I had no motive; I don't know that the hope of influencing my father in favor of the marriage influenced me in signing the deed. *Re-cross-examined:* I understand what the words "grant, bargain and sell" mean; I understand what the words "to have and to hold during his natural life" mean; I did when I signed the deed; I understood the object was for the deed to give him the land for life; Mr. Van Buren Green was the first person I talked to about having conveyed the land, after I was married; I afterward talked with my husband about it; once Bob Miller asked me about it;

I also talked with John Miller about it; this was in the winter after the marriage; I don't know that I was with my husband when attorneys were employed to bring this suit; my father treated me well after the deed was executed. *Re-examined:* I was once with my husband at Alexander's office when the facts of this case were talked of, long before the suit was brought; when I talked with Jim Miller about the deed after the marriage, the conversation was brought up by myself.

James Miller, for plaintiffs, testified that on the 14th day of May, 1874, defendant declined to go with him that day to attend to a shipment of wheat, in which they were both interested, saying that he was writing to his son, William; that he wanted the letter to go in the mail that day, and as he had no stamp, would have to take it to the office himself. Witness fixed the date by another letter, which he produced.

John G. Miller, for plaintiffs, testified that his brother, Robert Miller, who was security on the bond of defendant as guardian of William and Margaret, asked defendant to relieve him from that bond; that defendant said it would be all satisfactory, and afterwards, between the 1st and 10th day of May, came back and told Robert that he had made it satisfactory; he said that he was in trouble, that he did not care for himself, that his life was not worth anything to him; that if certain ones crossed his path, and Silas Miller was one, he didn't know what would be the consequence; his daughter's marriage was talked of, too; he said he was opposed to the wedding of his daughter to Silas; he said he was bitterly opposed to it, that you know they are related, cousins; Robert spoke of the property, and suggested the property might change hands; they were twenty-one, and it was theirs; he said he knew that.

Hellenkamp, for plaintiffs, testified: I had a conversation in the latter part of August, 1874, with Wm. T. Simonds about the marriage which had taken place be-

tween Silas and his sister; he said that he was opposed to the marriage; that they are married now, that it made no difference; that his sister was all he got; that the other part we had fixed before; I couldn't say what "we" meant from what Wm. T. Simonds said, only from what I myself inferred.

Defendant, in his own behalf, testified: I came to St. Charles Saturday before the deed was written to meet my son; he came to get some money; I had no idea he would be here; I gave him the money; I told him of Robt. Miller's request to me to settle the curatorship; I told both of my children of Miller's request; that I would bring them into town in order to settle up this curatorship; I didn't discuss the manner in which I would settle; that we would come to King, who was familiar with it more than I; we came to town; they got out at King's office, and I went down and put up the horse at Dierker's stable; was gone some time; I came up to King's office before dinner; found daughter and son there; they said they had made a deed to me, conveying their interest to me in their real estate, and I insisted that they should not do such a thing; I told them I had raised and educated them, and taken care of their property up to this time, and they had better take their property and do what they pleased with it; that I had about $1,200 in bank, a crop of wheat not sold, and one in the field; that I would take this and my personal effects and buy me a little home of my own; my daughter remarked, " I feel that this is just what we ought to do, that you have educated and raised us, and we have given you a home when you are old;" I don't know that much more was said in regard to the conveyance; after I had remonstrated as above, all I could, I said it would be a trouble taking care and paying the taxes, and I would rather they would take it; I can't say this was before they had signed the deed; don't remember; it was before they had delivered the deed to me; the receipt was also delivered that day; I came to King's office to see about the settle-

ment of the curatorship; that was my entire business in town, except bringing in my son to go to St. Louis; dined at Ruenzi's that day; son and daughter with me; don't think this matter was ever named at the hotel; I think we went to King's after dinner; I think the papers were then delivered to me; there never has been a word said to me about this deed before that day; I never spoke or wrote to my son about the execution of this deed before the day in question, and never to my daughter; no idea of a deed from them to me was ever entertained by me; I did not consult with Judge King as to the nature of that receipt; I told him I wanted a settlement of my cura-' torship of my children; after he (Judge King) was informed that they were twenty-one, he told me that all they would have to do was to give me a clear receipt, if they were willing; they said they were satisfied; at Robert and John Miller's gate, I met Robert and John Miller; Robert Miller said, "have you ever settled up that curatorship?" He was on my bond; I told him that I would do it, that nothing was coming into my hands; I have been careless about it, they are of age, I will do it; then I brought them into town and settled it; I afterwards told him of it; he said he was glad of it; the above conversation was what made me come to town and fix up the receipt, and was before the deed was executed; I told Robert, in the conversation, about their (Silas and Margaret) intended marriage; I might have said I was opposed to it; I was opposed to it on account of relationship; I might have said, also, that I hated to see her go into a family that treated us with such indifference as they had; my principal reason of objection was the relationship; recollect the conversation about the bills before the marriage, just as she stated; I complained of a large bill; she said, "I have given you all I had;" I said, "I don't want it." Last winter, after her marriage, she remarked, "pa, I have something to say to you, and I hope you will not object to it;" I said, "what is it?" She said, "pa, I want you to give me back my interest in

the land;" I said that I wasn't prepared to say anything about it, that I hadn't expected such an application; she had frequently been to my house; that was the first time she had mentioned it to me; I had not often been with her alone; she often came to see us; I went to see them for a time; she again spoke of it along that winter; she wanted to know if I wouldn't relinquish to her the land; that I had had time to think about it; I told her I would not; my reasons were these: I thought the land was safe in my hands, and that when I was gone it would be safe for my children; I never intended, when I said I would give it back, that I really would give her the property back; I only meant to quiet her about bringing the charge against me that I had got all she had; my daughter, after the deed was made, up to her marriage, she lived with me; she expressed, in that time, no regret at having made the deed; I wrote the letter on May 12th, 1874; I wrote no other letter to my son on the 14th of that month; I can say this positively. *Cross-examined:* I said the reason why I would not give back the property to my daughter was that it would be wasted; Miller is sober; he has property of his own; he is able to support her and give her a home; I paid for the deed Judge King wrote.

Wm. T. Simonds, for defendant, testified: I remember the execution of the deed; I came home to get money, and unexpectedly met my father in town, and went home on his horse and remained until Monday; I remarked to my sister that father was getting old, that I had a profession which would support me, that I had heard she was going to get married, that her husband would support her, and suggested the idea of giving father a home; we had better give him a deed during his lifetime; that at his death it would naturally revert back to us; she said she thought it was a good idea, it is the thing we ought to do, that he had spent all he ever made and raised us; and I remarked that giving him the property would be a stimulus for him to improve it, and that when it did come into our hands

it would be worth that much more; she asked me when we would make this deed to pa; I said Monday, as I had to go to St. Louis; we had as well fix it up then; nothing more was said then; pa came home that night and said Robert Miller told him to make a settlement of curatorship, and we must go to town Monday and fix it up; nothing was said about the deed at all; Monday we came to town; father drove and sister and I sat together; got out at King's office; stated our business; King said that it was necessary to get the papers; father had then gone off with the team; King got the papers, came back and wrote the deed; about that time father came back; we told him what we had done, sister and I; he said he didn't ask it of us, he had enough to live on without it; that we could do with it as we pleased; we both remarked that it was what we wished to do to secure him a home; we then went to dinner; nothing more was said about the deed; after we came back, Mr. McDearmon read the deed, and asked if this was our act without undue persuasion, to which we answered yes; I told my sister if she didn't approve of it, not to sign it; she said it was just what she wanted to do.   Why did you tell her that (by the court)?   Had your sister objected before?   No, she had not; I asked her the above question because of what was in the deed upon reading it over; pa asked Judge King about the receipt; King asked if we were of age; he answered we were; King said we could give the receipt without going into court, as we were of age; the receipt was explained to sister; he told us that $80 was coming to us, and he offered to pay it then; we said we didn't want it; I understood the receipt to be a full discharge to our father; on the Saturday previous to signing the deed and in Judge King's office were the only conversations we had about the deed; I told her the property came by our mother, through inheritance; that we had a half interest, as was fully understood; I never, at any time, spoke to my father about making the deed, until in the office the day it was made; nothing said about it on

the trip to town; my sister made no objections to coming to town that day; I can't say she was sick; she never was right well; her mind is as good as any one's; she has more than an ordinary education and understanding; she was not unusually excited the day she executed the deed; she seemed to understand fully what she was doing; the deed was signed after dinner; the conversation with father, as related, was before dinner; remember conversation with Rudolph Hellenkamp; I remarked that Silas Miller had married my sister, and that all he did get was my sister; I remember saying "we had fixed the thing up," meaning my sister and I, not my father; that was after the marriage and after the deed was made; about the time of that letter introduced, I don't remember of any other. *Cross-examined:* I meant it was all Silas Miller did get; that is my sister; I meant by that other matter that I and my sister had put the property in father's hands; McDearmon read the deed over, and asked my sister if it was her act without any undue persuasion; he used the words because it was his business as notary; I had no other property except that contained in the conveyance.

King, for defendant, testified: I drew the above deed at the request of Simonds' son and daughter; they came in alone, the brother and sister; they explained what they wanted; I went to the recorder's office and got descriptions; I pursued their directions; they expressed feelings of gratitude for their father; he had educated them, they said; wanted to give him a home; her brother did most of the talking; I understood her to assent; I explained, I think, the purport to both; Mr. J. W. Simonds never mentioned the matter to me before the deed was executed; had not been there in our office; I never heard W. T. Simonds persuade his sister to sign it; it seemed to be understood when they came; I was gone an hour or so, perhaps; I left them in the office; they were there when I returned; I could not say that the young lady spoke sep-

arately from her brother cr not; I understood her to assent; he did the talking, she assented.

*Theodore Bruere* and *T. F. McDearmon* for appellant.

1.   The rule that the law looks with disfavor upon a conveyance made by a child to his parent, and casts upon the latter the burden of showing the fairness of the transaction, does not apply to a case like this, where the child is more than three years beyond her majority. *Garvin v. Williams*, 44 Mo. 470. It is intended for the protection of children of tender age, or those not yet emancipated from parental control, not for a woman such as this plaintiff. She is, as her brother testified, a lady possessing a mind as good as any one and of more than ordinary education and understanding. She had been away from home and attending two terms and a half at a female seminary, and showed a remarkable independence of character by entering into the most important and sacred relation in life, that of marriage, not only without consulting her father and brother, but against their express wish and notwithstanding their opposition.

2.   The deed was not obtained by any undue or improper influence. Mrs. Miller herself so testifies. Defendant testifies that there had never been a word said to him about the deed till the day it was executed.

3.   The evidence is conclusive that defendant did not combine or collude with his son to procure the execution of the deed, nor did the son, under the defendant's direction and in connivance with him, persuade her to make the deed.

4.   Defendant insists that the proof affirmatively shows that the transaction was entirely free from undue influence. The case differs from *Ranken v. Patton*, in two essential particulars.   1st. In that case no motive of affection or gratitude prompted the grantor.   In this case it is admitted that affection and gratitude induced the gift.   2nd. In that

case the grantor did not at the time know what was the amount or value of the property she was conveying, and the grantee, though possessed of the knowledge, failed to disclose it to her. Here the grantor was raised, and living on the very land she was conveying, admits that she knew " she was conveying only a life estate in the same"—a lady of more than common intelligence and well educated; there an ignorant girl, living in Ireland, who never had any knowledge of the magnitude of her estate in this country, conveying in fee, and who was purposely left in the dark about it by her guardian, who was instrumental in inducing her to make a deed. Can there be any greater difference?

*Wm. A. Alexander* and *H. C. Lackland* for respondents.

The purpose to give never originated in the breast of the donor or from a disinterested source; it never was her free and voluntary gift, independent of the control or influence of her father and her brother; it was a hasty, indiscreet and thoughtless act, done without deliberation or advice, and in utter ignorance of her rights; defendant, her father and guardian, made no effort to inform her of her rights, as he was bound to; she was a mere wax figure in the hands of these two men. This case comes fully and fairly within the rule of the following cases, and the deed ought to be set aside without hesitation by this court. *Street v. Goss*, 62 Mo. 226; *Garvin v. Williams*, 44 Mo. 475; *s. c.*, 50 Mo. 206; 1 Story Eq. Jur., §§ 317, 309; *Huguenin v. Baseley*, 3 Lead. Cas. Eq. 473, 488, 491; *s. c.*, 14 Ves. 273; *Archer v. Hudson*, 7 Beav. 551; *s. c.*, 3 Lead. Cas. Eq. 489; *Revett v. Harvey*, 1 S. & S. 502; *Jennings v. McConnel*, 17 Ill. 148; *Young v. Peachy*, 2 Atk. 258; Madd. Chan., 310; *Bergen v. Udall*, 31 Barb. 9; *Taylor v. Taylor*, 8 How. 183; *Slocum v. Marshall*, 2 Wash. C. C. 397; *Highberger v. Stiffler*, 21 Md. 339; *Gale v. Wells*, 12 Barb. 84; *Whelan v. Whelan*, 3 Cow. 537; *Brice v. Brice*, 5 Barb. 533; 6 Ves. 278; *Mait-*

*land v. Irving*, 15 Sim. 437 ; *Yosti v. Laughran*, 49 Mo. 594 ; *Ranken v. Patton*, 65 Mo. 415.

SHERWOOD, C. J.—The principles applicable to this case have been so frequently asserted in this court, that it seems like a work of supererogation to restate or reapply them.

Though the daughter, Margaret, had attained the age of twenty-one in the February prior to the execution of the deed, and, therefore, according to the ruling of this court in *Caho v. Endress*, 68 Mo. 224, had, some three years before, become of age, yet it is quite evident that she was totally unversed in the ways and wisdom of the world, and notwithstanding her majority, still remained in the leading strings and under the influence of parental authority. In these circumstances, and but a short period before she executed the deed in question, less than a month she thinks, her father reproached her with the design of turning him out of house and home ; said he had heard it, but when asked by the daughter who told him, and how he thought she could possibly do such a thing, even if she desired, he refused to tell her who told him, and said he never would tell her. There is every reason to believe this story was woven in the loom of the father's own invention, since he does not attempt to deny that he made such statement, and it is by no means improbable that he charged the daughter with cherishing the unfilial design of turning him out of house and home, just after he was pressed by Robert Miller, his surety on his curator's bond, to relieve him of that suretyship, when it was suggested by the surety that as the wards were twenty-one " the property might change hands." The conversation of defendant with Robert Miller, took place between the 1st and 10th day of May, 1874, and in that conversation defendant expressed himself as bitterly opposed to the intermarriage of his daughter with Silas W. Miller, the plaintiff. It is in evidence that defendant, though he denies it, wrote to his son on the 14th day of

May, 1874, and that he expressed himself as very desirous of mailing the letter on that day, and so anxious was he on this point, that he refused to go with the witness to see about shipping some wheat in which he was interested, but took the letter himself to the office. If the letter was written and mailed on the 14th day of May, this would cause its arrival in St. Louis on the 15th, and if it reached the son then, this would give him opportunity to reach home, if his presence was desired there, by the 16th day of May. On that day, Saturday, we find he did reach St. Charles, some eight or ten miles from Green's Bottom, where the defendant resided. As to the arrival of the son at that time, the testimony of the defendant is singular. He says: "I came to St. Charles, Saturday before the deed was written, to meet my son," and yet in the next sentence he makes the inconsistent statement: "I had no idea he would be here!" The letter of the 12th day of May, written by the father to the son is in the record, and contains no request to the son to come home, nor does it contain any matter which could imperatively require its being mailed on the day it bears date.

The son, on his arrival, was immediately informed of Robert Miller's request to have the curatorship settled, and when he reached home he proposed to his sister that they should give "their father a home;" that they had "better give him a deed during his lifetime." To this proposal she readily assented, and on Monday following, without further conversation on the subject, the deed in question was drawn up at King's office, in St. Charles, in the temporary absence of defendant, and without his knowledge or solicitation, as he alleges. The daughter states, however, that while she was on the porch of King's office, and a few moments before the deed was executed, her father told her he had plenty, and that she need not sign the deed unless she wished. The receipt acknowledging payment and satisfaction of all moneys and property received by the defendant as curator of the estate of his wards, was executed

by them the same day, and without any examination or exhibition of the accounts of the defendant in that capacity, and without any explanation to the daughter of the nature of the receipt thus given. In the conversation which took place at King's office prior to the deed being drawn up, it is very far from being clear that the daughter fully and clearly understood the purport and effect of the deed or the quantity or value of the interest thereby conveyed; nothing in short to show that she was much, if any thing, more than a mere assenting party to the suggestion of her brother. It is true the father made a very proper and apparently very generous reply on being told that his children were about to convey him the land; but even that reply, whether so intended or not, was well calculated to convey the false impression that without the deed being made, he would be turned out of house and home, and forced to employ his limited means to purchase a little home of his own; when the truth was, that he already had a life estate in eighty acres of the land, on which the dwelling house is situated, and which he would still retain regardless of the execution or non-execution of the deed; and the apparent disinterestedness of the defendant on the reception of the deed, is strangely at variance with his disingenuous conduct but a few days thereafter, when complaining of some bills he had to pay for his daughter, and reminded by her of her recent gift of the land, he promised to give it back to her, when, as he says himself, he had no intention to do so, but only intended "to quiet her." After the marriage occurred, she reminded the defendant of his promise again and again, until he finally forbade her to mention the subject to him any more.

I have found it difficult to resist the impression, from a perusal of the evidence, that there was a concert of action or at least an understanding between the father and the son that the deed should be procured; and difficult also to resist the belief that the son came up from St. Louis on the 16th day of May in response to the letter which a disinter-

ested witness testifies was written and mailed to him on the 14th day of that month by defendant. And this impression is greatly strengthened when I reflect upon the bitterness with which the defendant and his son opposed the marriage, upon the fact that defendant made the false statement to his daughter, that he had heard that she was going to turn him out of house and home, and upon the evident zest with which the son told Hellenkamp after the marriage, that his sister was all that Miller got; "that the other part, we had fixed before."

But it is entirely immaterial in this case, so far as concerns the conclusion which should be reached, whether there was concert of action between the father and son or not; it is sufficient that the son was the moving cause of his sister executing the deed; that she did the act which deprived her, during the lifetime of her father, of all the property she had in the world, improvidently, without time or opportunity for proper reflection, and in the absence of independent advice, and while she was not yet emancipated from parental and fraternal influence. And it is well settled that the undue influence need not proceed from the recipient of the ward's or donor's bounty, but it is equally fatal to the validity of the gift that such influence was exerted by a third person. *Ranken v. Patton*, 65 Mo. 378; *Ford v. Hennessey*, 70 Mo. 580. There are many points of coincidence between the present case, and that of *Ranken v. Patton, supra*, as was very pertinently observed by the St. Louis court of appeals, when this cause was before that court, (5 Mo. App. Rep. 33;) and the same ruling which held the gift for naught in that instance, would hold it for naught in this one. Such gifts are watched by courts of equity with the most jealous scrutiny, and generally held as presumptively void; (*Garvin v. Williams*, 44 Mo. 465,) and the burden is cast upon the donee to show in the clearest and most satisfactory manner that the gift in question is one which is in every particular worthy of receiving the sanction of a court of equity. *Street v. Goss*, 62 Mo.

226, and cases cited.   It is scarcely necessary to add that the evidence before us falls far short of the standard just mentioned.   As the result of the foregoing reasons, the judgment of the court of appeals should be affirmed.   All concur, except RAY, J., who did not sit.