## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

DAVIS & UX. V. STRANGE'S EXECUTOR.

APRIL 10th, 1890.

EQUITABLE JURISDICTION AND RELIEF—*Undue influence*—*Case at bar.*—Where daughter, in situation of sudden surprise, without advice of friend or counsel, and when rendered unable to exercise a consenting mind, by the undue influence of her father and of his attorney, who pressed her with importunity and strong persuasions, and assurances that she would be otherwise provided for and compensated, and that it would be best to convey the property back to her father, as it was threatened to be burned, hastily and inconsiderately executed a deed granting the property to him without any consideration whatever: *held,* a case for equitable relief.

Appeal from decree of circuit court of city of Lynchburg, rendered January 3, 1889, in the cause wherein Alice Lee Davis and her husband were complainants, and Thomas V. Strange's executor and heirs were defendants. The object of the suit was to set aside a deed for undue influence. At the hearing the bill was dismissed, and complainants appealed. Opinion states the case.

*Kirkpatrick & Blackford,* for the appellants.

*R. G. H. Kean* and *T. N. Williams,* for the appellees.

FAUNTLEROY J., delivered the opinion of the court.

The bill in this cause was filed by appellant, Alice Lee Strange, to vacate and annul, and to set aside a deed, executed

by her August 26th, 1887, by which she conveyed to Thomas V. Strange a house and lot in the city of Lynchburg, Va., of the value of $8,000 or $10,000, without consideration; in a situation of sudden surprise and emergency of action; without the presence or advice of friend or counsel; and when she was rendered wholly unable to exercise a consenting mind, by the undue influence of her father and of his attorney and agent, who presses her with importunity and strong pursuasions, and assurances that she would be otherwise provided for and compensated; that she should not lose anything by it; and that it would be best for her to make the property back to Mr. Strange, as it was threatened to be burned; under the compulsion of which, she, hastily and inconsiderately, executed the deed, to which she had been already most powerfully moved and induced by the distress and suffering, expressed and exhibited to her, of her aged and devoted father; occasioned to him by the reproaches and importunate remonstrances and interference of his son-in-law and other daughter.

The facts of this case, as disclosed in the record, show the environments of the appellant, and the actual, relative, and correlative circumstances in which she was placed, and under which she was improperly induced to the hasty, inconsiderate and unconscionable transaction, which she prays to be relieved from by the equitable jurisdiction of this court, reviewing the denial of her prayer and the dismissal of her bill by the circuit court.

Alice Lee Strange, who, since this suit was instituted, has intermarried with Joseph S. Davis, is the natural daughter of the late Thomas V. Strange, of Lynchburg, a white man, by a colored woman named "Belle." She was received into the family of her father as his child, and treated, both by his wife and himself, as the petted daughter of the household, with equal rights and recognition with his legitimate child. Every advantage of education was afforded her; and, when old enough to leave the paternal roof, she was sent to a boarding

school in Washington city, where she remained until she grad-uated. It is the fact—the status—of this relation of parent and child, and the family recognition and association, which obtained between the appellant and her father and his house-hold, which it is important to state and remark: however revolting to the moral sense and offensive against public policy. The relations which existed between her and her father and his wife and the whole family, are indicated by a number of letters from her father to her, written during her absence in Washington, which are filed as exhibits with the bill. They show the deepest parental affection and the most anxious and tender solicitude and guardian care over her and for her as his favorite child; and his liberal intentions toward her in regard to his estate, and that he freely conferred with her in regard to his intentions. They not only show her environments and motives, which, through her filial feelings, over-mastered her will in the rash and immoderate act into which she was pre-cipitated, and from which she now seeks relief; but they reveal the hidden thought, powerful influences and agencies which instigated and controlled a transaction, in which her father was as unwilling and as much wronged a victim as was the daughter herself.

We cannot extend these letters, in this opinion, as they appear in the record, in their full length and significance; but a few extracts from some of them will illustrate our commen-tary. On the 18th of November, 1878, he writes:

"MY DEAR ALICE: Yours to mine of the 11th inst., was read to me last night by Minnie, (his wife) so far as she could for sobbing; for she can never read your letters without cry-ing. Please recollect what I have before said to you, that is to do well for yourself; if you do that, all will be well with you. That means much more, perhaps than you are aware. It is the great concern of men advanced in life, to know what to do with what they have accumulated by industry and economy

and prudence; men of my own stamp, for instance, don't leave their effects to fools and spendthrifts."

On the 12th of December, 1878, he writes:

"DEAR ALICE: Your postal card to Minnie (his wife) to hand at the store (of Strange & Litchford). You know that I have before asked you not to write on P. C. to us. It is a fact, that we have kept secret from you, that you are hated by one in the family with unequaled hatred, and simply because Minnie and myself love and provide for you, and so intend to do. It was because of that that Nannie (Mrs. Litchford) went to the springs last summer, at a cost of $150, to prevent her from staying in the house with negroes. When you visit Lynchburg you are not to visit them, though Nannie and the children will visit you. I hope and pray that your talents will place you head and shoulders ahead of them, whilst I wish them all good luck, both parties are of my family. I care for all, and wish to place all beyond the powers of this world, but you in particular I wish to see stand prominent in the land because of your worth. We don't hear from Belle and Charlie."

On the 31st of July, 1879, he writes:

" DEAR LOVED ONE: Your last of 30th inst. to hand; all three of your letters to hand. Last one causes uneasiness for fear of my letter to you on Monday, 28th, draft for $25, is lost or stolen. *  *  Don't think that I will ever forget you. That would be impossible, after Minnie and myself having raised you, and the request that I would never forsake you, and still more to stand by and see you complete your studies. Two people were never more devoted to each other than Minnie and myself, and for her sake, if no more, you will not be forgotten or forsaken. Death is one of the uncertain things of the world, and therefore I shall leave in the hands of J. E. Yoder some important papers for you, and with the request, in the event of my death, that you be at once informed of it, that

the proper steps may be taken to secure your interest. I have much to say. God bless you."

On the 10th of October, 1879, he writes:

"DEAR CHILD ALICE: Some several years since I made a will, which was then my will, but since the death of Minnie (his wife) it is right to make another, which was done yesterday, and is in the hands of J. E. Yoder, who was one of the witnesses of the same, as was also Mr. Work and Mayor Branch, in which you are largely interested. Should I drop off you will be posted. It is entirely secret, and will so remain until my death. Say nothing of it to any one, but I have made arrangement for Belle to have $150 per annum, unless she marry; in that event she has nothing. I mention this to assure you that you will never be forgotten. Not a word from you since the telegram. How is that? God bless you, Belle and Charlie. If you write, and I don't get them, I must get a box to myself."

Thus showing his apprehension that some one unfriendly to her (meaning his son-in-law and partner) would intercept their correspondence if his mail continued to come with the general mail of Strange & Litchford.

On the 23d of October, 1879, he writes:

"Yours of the 19th and 20th to hand. Next Monday I will send you amount promised. I want you to keep on with music and drawing, as Minnie requested. Her life was tied up in yours, and if I am to carry out any wish of hers on earth, it is to complete your education and then to see that you are provided for. Will send the dress as soon as ready. May kind words be with you and God's blessing rest upon 'you. If you will start on teaching you will find that you will rise very fast. If you marry you will be tied down. There is much ahead for you."

On the 20th of November, 1879, he writes:

"DEAR CHILD: Yours of the 16th at hand to-day. Am always glad to hear from you. Am glad your music scholars

are on the increase. It afforded me happiness to do or say things to make our angel Minnie happy; and she, as you know, left nothing undone to make me happy or comfortable, and consequently two people never got on better than we did, and from day of our marriage to her sickness our attachment increased for each other, and now soon be five months since her death, and yet I can't realize the fact that she has gone to the spirit land, and if I was the Christian that she was, I would rejoice for the time to come for me to go to meet her. Nannie is all to me that she can be; nothing left undone that can be done for my comfort; yet, after all, if I could be with you and Belle it seems it would be a paradise to me. I advise you against writing to Nannie on account of her selfish husband and his hatred for you, not for any wrong that you have done him or any other living soul, but because you were loved by Minnie and myself. I expect the day will come when you will soar long above him, and for that end never cease to strive. I enclose X. Will send the other toward the end of the month. May God's blessing rest upon you, dear child, and the other two."

"LYNCHBURG, April 20th, 1884.

"MY DEAR ALICE: No doubt you think long time my delay in writing. Writing has got to be quite irksome to me; hence one cause of delay, and next to that the pressure upon me. As to my taking up the two notes before they are due, I do not now see how to do it, as we have just got through a $20,000 job—namely, the mill. I will take them up, however, as they come due. Our city is making rapid strides of improvement. I expect to be over in June. Affectionately,

"T. V. STRANGE."

These extracts show that appellant was very dear to her father and his wife, and that his full intent was not only to educate and take care of her while he lived, but to make ample provision for her at his death. With deep parental care for his favorite child, and with solicitude lest she should, by

some accident, not be provided for, he made his will in 1879, in which she was provided for, and which he gave to Mr. Yoder for safe-keeping. He apprised her of it, and that she was largely interested in it. In the year 1881 he determined to change his scheme of providing for her by will, and placed his bounty to her in grants by deeds; to protect her, no doubt, as far as possible, from the contingencies of his own advancing age, and the machinations of his son-in-law, whose selfish hate he so dreaded, and against whom he, with prophetic wisdom, intended to shield her.

On the first of August, 1881, he purchased and conveyed to her a dwelling-house in Washington city, costing $3,500. The deed was drawn by his counsel, Mr. W. D. Branch, and declares that it is made "in consideration of the obligations growing out of the peculiar and near relations existing between him and the said Alice Lee Strange, which relations, under a sense of duty, not only to her, but to his God, he feels bound to acknowledge, and takes pleasure in heeding; and also in consideration of personal kindnesses and attention shown and services rendered him by the said Alice Lee Strange, as well as in consideration of the earnest request made of him by his wife before and in her last illness."

On the 22d of December, 1881, he conveyed to his daughter Alice, by a deed, the property in Lynchburg, now in question, reserving a life estate to himself. The consideration for this grant, the deed declares to be "valuable services rendered him by said Alice Lee Strange, as well as in consideration of the anxious and earnest request made of him by Ann N. Strange, deceased, his late wife, in her last illness, to make ample provision for the support, comfort and maintenance of the said Alice Lee Strange, which request, having promised faithfully to comply with, he feels in honor bound to obey; and for other considerations him thereunto moving." Having executed and delivered this deed, on the next day, December 23d, 1881, he made his will, the one which went to probate, and which was

written by his friend and legal adviser, W. D. Branch. By this will he gave all his estate to his daughter Nannie M., the wife of L. E. Litchford, for life, with remainder over to her children. Beside what he gave to Mrs. Litchford by this will, he had already made large advancements and conveyances of valuable realty to her. Thus he had provided for both his daughters; had satisfied his conscience and his own devoted attachment to his child Alice, by making good his sacred promise to his dying wife; and, as he vainly thought, had protected his best loved child from the contingencies of fortune, and the dreaded avarice and hate of his selfish son-in-law.

Alice, having entire confidence in her father, did not put the deed for the Lynchburg property to record; and things remained unchanged until the summer of 1887, when some injudicious friend erroneously advised her that both the deeds to her were void, because no money consideration was named in them. She therefore brought them back to her father, who, at her request, reconveyed both pieces of property—that in Washington and that in Lynchburg—to her by two other deeds bearing date August 18th, 1887, wherein he repeats the considerations named in each deed for which they were, respectively, substituted, and adds in each the words, " and in further consideration of five dollars in lawful money of the United States to him in hand paid by the party of the second part."

His willingness to re-execute, so as to quiet any apprehensions in regard to the validity of the grant, and his solemn reaffirmation of his motives for making the conveyances, attest the fact that his affection and determination to provide for his " dear child " were as warm and fixed in 1887 as in 1881.

Alice placed the deed to the Lynchburg property on record on the day it was executed, and this became the Iliad of woes to her, and to her devoted old father. Up to that time, the fact of its existence was known only to her father and, to W. D. Branch, and to herself; and the jealousy of the Litchfords

seems to have slept in the comfortable knowledge that, by the will of 1881, Alice was excluded from all participation in her father's large estate; and they rejoiced in the belief that their father had ignored his sense of duty to his God, had broken his sacred promise to his dying wife, and was rapidly closing his days on earth, unmindful of the child of his best affection, whom he had tenderly nurtured and for whom he was so anxious to provide. The recordation of the deed discovered their error, and rudely shocked their fancied security in the exclusive enjoyment of the whole of their feeble old father's large estate, and roused them into jealous and energetic resistance.

Poor old Strange, " in lean and slippered pantaloon," and in a condition of senile imbecility, lived at Litchford's house. When a copy of the deed was procured from the clerk's office, the family was thrown into a high state of excitement. Litchford at once sent off for Mr. W. D. Branch, the family lawyer, and asked him to come to his store, and then sent him over to his house to see Mr. Strange, who he said was wanting him. Litchford had told Mr. Strange, with impassioned violence, that he would rather see the property burned down than that it should go to Alice; and Mr. Branch, with his mind attuned to Litchford's sentiments (of which his burst of indignation to poor old feeble Strange was, doubtless, a fair sample), went over to Litchford's house to see the culprit who had shocked the long latent moral complacency of his son-in-law and daughter by the development of a diversion of a small portion of his large property to his darling child; and so much from their jealous and selfish expectation. The old man was sitting on the porch alone; but, upon Mr. Branch's arrival, Mrs. Litchford came upon the scene, holding up the offensive deed, and exclaiming: " See what father has done; I don't believe he knew what he was doing when he signed it!" This stormy drama wound up with a demand by Mrs. Litchford upon Mr. Branch to know " *What must be done ?* " and, on his saying that

the law had no remedy, the poor old father, impotently shrinking from the selfish ire which was aroused, said: "I believe I can get Alice to re-convey the property to me; I don't think she will refuse me." This suggestion, which was the real object of the interview, was eagerly caught at; and it was arranged that Mr. Strange, and Mr. Branch to accompany him, at the request of Mrs. Litchford, should take the early train, the next morning, and seek Alice down at Chatham, in Pittsylvania county (where she momentarily was on a visit), and get her to reconvey the property, by a deed which Mr. Branch was to carry down, ready made, so that there. should be no delay, and no time for reflection, or consultation, or advice. This poor, old, dying man, who, in a week afterwards, was at rest from his sorrow, was taken down, to be made the unwilling instrument—a puppet in the hands of the managers—to sacrifice the rights of his dear child Alice, that his few remaining days might be passed in peace. Had she been brought to him in Lynchburg, she would have had time to think, and to confer with friends—even, perchance, to consult counsel; but in Chatham she was without advisers and a stranger, and would the more easily yield to the piteous plight of her tottering old father, and the persuasive presence of the counsel of those who were the real and potent projectors of the scene, and the expectant beneficiaries of the sacrifice.

To Chatham they went, on the 26th of August, 1887, on the early morning train, and found Alice at the house of Polly Davis on the side of the road which leads from the depot to the village. Polly Davis, it is important to note, was no relative, nor even an acquaintance, of Alice Lee Strange, except as a visitor for a few days to a schoolmate acquaintance in Polly Davis's house. As Mr. Strange and Mr. Branch passed the house, Alice was in the yard, saw her father and called him to her; and he and Mr. Branch took breakfast with her and the family. After breakfast, Mr. Strange and Mr. Branch went out on the porch, and Alice, after aiding in household duties

which were requisite, joined them on the porch, and carried on a conversation, chiefly with her father about her affairs in Washington. This continued for some time, without a word of reference to the object of the visit, when the old father, shrinking from the unwilling task which had been assigned to him, got up and took Mr. Branch out for a walk. All Mr. Branch has revealed of their conversation during that walk, is, that he, fearing their trip might be in vain, told Mr. Strange that when he got back to the house, he must tell Alice of the object of their visit.

Mr. Strange is dead, and Alice's mouth is sealed; while Mr. Branch, who was employed, by those who were to receive the benefit, to induce this young and unadvised girl, in a moment of sudden and irresistible importunity, and of sympathetic sorrow at the sight of the halting gait, the trembling frame and quivering voice of the poor old father whom she tenderly loved and on whom she had implicitly relied and trusted as the devoted and faithful protector and author and guide of her life, without reflection, and without the advice of friends, or the counsel of a lawyer, to give away property which was valued at $8,000 00 or $10,000 00, and which she had held for over six years; he, Mr. Branch, with all the bias of his employment, and of the unfortunate position and part which he took in the transaction, is permitted to testify as to all the details of the execution and procurement of the deed.

Polly Davis, who is a wholly disinterested and impartial witness, paid no attention, and heard nothing that was said, until she heard Mr. Branch say to Alice, " It will be best for you to make this property back to Mr. Strange, as it was threatened to be burned; " and Mr. Strange said, " You shall not lose anything by it; " to which Mr. Branch added, " I will insure you shan't lose anything by it." To all this Alice had little to say, but would not consent. Finally after they had teased, her she commenced crying, and so did Mr. Strange. Mr. Strange said he would give her the worth in money, or

more than the worth of it; and Mr. Branch added, "If it remained like it was, it would be only the land there, and it would do her no good, because the people near there said no colored person should live there. He, Mr. Strange, seemed very feeble that morning—or weak, that when he went to breakfast and had to step down a little step, Alice had to help him, and he caught the side of the door. As to his mind, I don't know, as I was not well acquainted with him; but he seemed to be very easy to weep that morning, for a gentleman." This statement of Polly Davis has the verisimilitude of consistency, congruity, and truth. These gentlemen had come down from Lynchburg to persuade Alice to execute the deed; and, being there, it may be rationally believed they used every argument and persuasion in possible range.

But laying aside the evidence of Polly Davis and the allegations of the bill, and confining attention strictly to the glimpses of the transaction which are disclosed by Mr. Branch, and his deposition itself proves a case of unconscionable cunning and cruel wrong, which calls loudly and imperatively for the righteous interference of a court of equity. On the return of Mr. Strange from the walk with Mr. Branch, with his purpose nerved and his mind impressed by Mr. Branch's admonition of the danger of a failure in the object of their journey, he again took his seat in the porch, and, after waiting a short while, said: "Alice, I want you to re-convey back that property to me." "What property—the property in Washington?" she replied. "No; the property in Lynchburg," said he. "What do you mean; why do you want me to re-convey it to you?" asked Alice. "My family in Lynchburg," answered Strange, "are very much disturbed about my having given you this property, and Mr. Litchford says he would rather see me burn down all the houses on it, than to see me convey it to you. I thought that, as I had done a great deal for you and had been very kind to you, you would re-convey it to me." "Do you want me to re-convey it to you without any equivalent?" she

replied. "I have no equivalent to offer," said he. After this much, he went out in the yard, and commenced walking backwards and forwards, *a good deal distressed,* says Mr. Branch. But why a good deal distressed, if it was *his own* hopeful undertaking? Enough to distress him and to break his faithful heart and to bring him to the grave, into which he sank a few days thereafter, a victim to the mortification, which he keenly felt, of the sacrilegious wrong of violating his solemn promise to his dying wife and robbing a beloved child whom he had pledged his whole life to protect and to provide for. The pressure was too great for him; the conflict between his dread of those at home and his love for the daughter before him, was enough to distress him. Knowing, as he did, that he was the helpless instrument in this fraud on her rights—and he abandoned the attempt, fled the scene, and went out into the yard and walked backwards and forwards in speechless agony; and while Alice watched him with pitying eye and wrung heart from the porch, the cool and cautious Mr. Branch, steady to his undertaking and true to the expectations of those for whom he acted, took up the refrain and plied the persuasion: "Mr. Strange authorizes me, Miss Alice, to give you $250 00, if you will re-convey him this property; but I think he relies entirely on your gratitude. Has he not been very kind to you and given you a great deal? *I think,* under all the circumstances, *you ought to grant his request.*" "Has Mr. Strange written his will?" she asked. "Yes; I prepared a will for him, which was signed," he replied. He says he did not tell her that in that will there was no provision for her, *because she did not ask him!* What was the purport and only possible point of her asking him, quickly and sharply, in response to his saying to her that *he thought* she *ought to execute the deed and grant her father's request,* "Has Mr. Strange written his will?" But Mr. Branch saw no *suppressio veri* in this cautious reserve; and he says, "she seemed *very much disturbed,* and, *looking at her father as he walked backward and forward,* she said, 'I can't

think of causing him distress in his old age; he has been too kind to me; I will let him have the property back. I will be up in Lynchburg in a few days and will fix the deed." The victory was won; and the persuasions of Mr. Branch and the sight of her father's speechless, but eloquent distress, as he walked back and forth before her in the yard, had overcome the tender-hearted girl, and, yielding to the dominion of her filial love and lifelong duty and devotion to her father, she said she would be up in Lynchburg in a few days and fix the deed. But no; there was a *locus penitentiæ* in a few days reflection; and, if she got to Lynchburg, she might have advice and counsel as to her rights; and to avoid this very danger, Mr. Branch presented his ready-made deed, volunteered to go, and did hurriedly go, for a notary, who came and took and certified the acknowledgment of the deed, with which in his pocket Mr. Branch hurried back to Lynchburg, and put it on the record that day—he to receive the plaudit of the Litchford instigators and beneficiaries of the unconscionable wrong; poor old father Strange to lie down and die, and Alice to console herself with Mr. Branch's gratulating chuckle to her, on the consummation of the rape of her father's bounty, that he thought "she had acted very nobly." Mr. Branch knew that, in the former wills prepared for Mr. Strange, he had lovingly and lavishly provided for his child Alice; and Alice had been freely and frequently informed of his dispositions and unalterable purpose in her favor; and Mr. Branch knew that Alice knew that he was the legal adviser and confidential friend of her father; and yet, when she, in the extreme stringency and overbearing influences operated upon her to induce consent to the sacrifice which he told her *he* thought *she ought* to make, quickly, responsively and pertinently asked him if her father had made his will, he, with wily reserve, did not tell her what really it then and there concerned her to know—that she was wholly unprovided for in that will which, he told her, he had prepared, and, with his *confidential* knowledge of its provisions,

urged upon her, as his opinion, that, under all the circumstances, she ought to re-convey the property to her father.

Equity grants relief wherever influence is acquired and abused, or confidence reposed and betrayed. Lord Kingsdowne, in *Smith* v. *Kay*, 7 H. L. Cases, 750. Equity is especially jealous to guard the welfare of the weaker party in all contracts between parent and child, guardian and ward, attorney and client, trustee and *cestui que trust*, and, indeed, in all persons standing in fiduciary relations to each other. It is especially active and searching in dealing with gifts, voluntary conveyances and deeds without due consideration, though its range is so wide as to cover all possible dealings between persons holding such relations, or any relations in which dominion, whether physical, intellectual, moral, religious, domestic, or of any sort, may be exercised by one party over the other; or in which the parties contracting are not at arm's length." White & Tudor's Leading Cases in Equity, 1184, ed. 1887. In the case of *Dent* v. *Bennett*, 4 My. & Cr., 269, Lord Chancellor Cottenham said: "I will not narrow the rule, or run the risk of, in any degree, fettering the exercise of the beneficial jurisdiction of this court by any enumeration of the description of persons against whom it ought to be most freely used." In the famous case of *Huguenin* v. *Basely*, 14 Vesey, 273, Lord Eldon said: "The question is not whether she knew what she was doing, had done or proposed to do, but how that intention was produced; whether all that care and providence was placed around her, *as against those who advised her*, which, from their situation and relation with respect to her, they were bound to exert in her behalf." Among the relations, the mere existence of which casts suspicion on all business transactions between parties holding them, the one which most excites the jealous watchfulness of a court of equity is that of *parent and child*—especially where (as in the case at bar) it is the parent who is the beneficiary of the child's bounty, and when that bounty is large and entirely disproportionate to the means of the donor.

See Story's Equity Jurisp., sec. 309.   "In respect to bounties by children in favor of their parents, it is for the parent—father or mother—to show that no advantage was taken of his or her influence or knowledge, and that the transaction was fair and conscionable.   And the same is true of one standing in affection and influence in *loco parentis*."  Bigelow on Frauds (1888), 354. "Cause of surprise and sudden action, without due deliberation, may properly be referred to the same head of fraud or imposition.   An undue advantage is taken of the party, under circumstances which mislead, confuse or disturb the just result of his judgment, and thus expose him to be the victim of the artful, the importunate and the cunning.   The surprise here intended must be accompanied with fraud and circumvention, or, at least, by such circumstances as demonstrate that the party had no opportunity to use suitable deliberation, or that there was some influence or management to mislead him.   If proper time is not allowed to the party, and he acts improvidently; if he is importunately pressed; if those in whom he most places confidence make use of strong persuasion; if he is not fully aware of the consequences, but is suddenly drawn into the act: if he is not permitted to consult disinterested friends or counsel before he is called upon to act in circumstances of sudden emergency, or unexpected right or acquisition—in these and many like cases, if there has been great inequality in the bargain, courts of equity will assist the party, upon the ground of fraud, imposition, or unconscionable advantage."   If Judge Story had been commenting upon the facts of this case when he wrote this (sec. 251 of his Equity Jurisp.), he could not have more exactly described every feature, circumstance and character of this revolting transaction.

The leading English cases, developing the jurisdiction of courts of equity, in cases like the one under review, are collected and quoted in the notes to the celebrated case of *Huguenin* v. *Baseley, supra.*   See also Pomeroy's Equity, sections 951 to 957 inclusive.

*Rhodes* v. *Bate,* L. L. R., ch. 252–257; *Billage* v. *Southee,* 9 Hare, 534–540; *Miller* v. *Simmons,* 72 Mo., 669; *Wood* v. *Rabe,* 96 N. Y., 414; *Archer* v. *Hudson,* 7 Beavan, 551; *Woodbury* v. *Woodbury,* 5 N. E. Reporter, 275, and note on page 281–2; *Hoghton* v. *Hoghton,* 15 Beavan. In the case of *Bridgeman* v. *Green,* 2 Vesey, 627, and Wilmot's Opinions, page 61, the grantee carried his own attorney to the grantor to prepare the conveyance; which fact, coupled with the fact that the grantor had no counsel with him, is one of the grounds on which the conveyance was set aside. In that case, Lord Commissioner Wilmot, in speaking of Lock's conduct as the attorney of the grantee to procure the conveyance, says : " What was his duty to have done? Why to have remonstrated, or at least, with modesty and humility, to have inquired into the principles and motives of such a wild and immoderate act. A man of nice honor would have said in a moment, ' As I am an entire stranger to you and your circumstances, and there is something so extraordinary and uncommon in what *you* (not *I,* Mr. Branch,) propose to do, I will not be concerned in it on any account whatever.' He should at least have protracted the execution of such an extravagant purpose, and should have given time for deliberation." In that case Lock finished his exploit *in five days ;* in the case at bar, Branch, having by his persuasive urgency induced Alice to the wild and immoderate act of giving away her patrimony, and produced the intention of the extraordinary and uncommon gift, so far from protracting the execution and giving time for deliberation, demurred to Alice's proposition to go up to Lynchburg before she signed the deed; produced one. ready-made ; went for the notary; and the whole matter was completed, and he on his return to Lynchburg, inside of *one-half hour* from the moment that poor halting, hesitating and reluctating Mr. Strange opened the extraordinary proposal and request to his surprised, perplexed and helpless daughter.

In the case of *Statham* v. *Ferguson,* 25 Gratt., 38, Judge Mon-

cure says : " The first thing that strikes our minds in this investigation, is the extraordinary haste (*one whole week*) which occurred in the execution of so important an act, and the circumstances attending its execution." And yet, in that case, Mrs. Ferguson had the presence and advice of counsel and the presence and witness of several of her neighbors, in her own house, who had been called in to explain the matter to her and to see that all was fair and right. A unanimous decision of this court affirmed the court below in cancelling Mrs. Ferguson's deed and declaring it void, upon the grounds of public policy, as a fraud or imposition upon her rights.

In this case, the suggestion or proposal to do the wild and immoderate act did not come from Alice ; it was proposed to her by her father, under the coaching and urging admonition of Mr. Branch ; and when the poor old father sickened and revolted, and fled the scene and relinquished the effort, Mr. Branch renewed the contest, and plied the friendless child with persuasions, and (as she alleges in her bill and as Polly Davis distinctly proves) with *assurances* that she should lose nothing by executing the deed, and relinquishing her recorded and indefeasible right to $10,000 worth of property without consideration.

We are of opinion that the circuit court erred in denying the relief prayed for and in dismissing the bill; and that the decree appealed from must therefore be reversed and annulled ; and the deed of the 26th of August, 1887, from Alice Lee Strange to Thomas V. Strange be vacated and set aside.

RICHARDSON, J., and HINTON, J., concurred in the result.

LEWIS, P., and LACY J., dissented.

DECREE REVERSED.