SHACKLEFORD *v.* SHACKLEFORD.

Opinion delivered June 7, 1920.

1. PARENT AND CHILD—CONVEYANCES BETWEEN.—Where a deed is given to a mother by a child recently come of age, the transaction will be closely scrutinized, and the burden is on the parent to clear the transaction of every shadow of suspicion and to establish its fairness and good faith.

2. DEEDS—LOVE AND AFFECTION AS CONSIDERATION.—A deed executed to a parent by a child after reaching majority for love and affection is binding if the transaction is thoroughly understood and voluntarily made.

3. DEEDS—UNDUE INFLUENCE.—In a suit to cancel deeds to a mother by her son and daughter, executed when they had recently come of age and while they remained under her roof, evidence *held* to establish that they were procured by undue influence.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; reversed.

*Samuel Frauenthal* and *Grover T. Owen,* for appellants.

The deeds were obtained by undue influence and on a promise to reconvey. Appellee is a self-constituted and

self-confessed trustee, and stood in a fiduciary capacity, and the court erred in not canceling the deeds. 43 N. E. 336; 6 Cyc. 335, 681; 186 Pa. St. 314; 29 Cyc. 657; 102 Ark. 232; 12 Peters 241; 173 U. S. 17; 1 Black on Resc. & Can. 659; 18 A. & E. Anno. Cases 538; 51 So. Rep. 321; 1 Black on R. & C., pp. 667, 633. The burden of proof was on defendant. The findings of the chancellor are not conclusive. In chancery appeals the case should be heard *de novo* on the whole record. 75 Ark. 72; 149 S. W. 60; 43 Ark. 307. If the findings are erroneous the cause should be reversed. 31 Ark. 85; 85 *Id.* 617; 98 *Id.* 159; 102 *Id.* 383; 92 *Id.* 315; 76 *Id.* 156. Undue influence is proved. 87 Ark. 148; 75 Fed. 480. The burden was on defendant and she has failed and the chancellor erred in his findings.

*Price Shofner* and *Mehaffy, Donham & Mehaffy,* for appellee.

The findings of the chancellor will not be disturbed unless against the clear preponderance of the evidence. No showing of a promise to reconvey is made, nor is there proof of any undue influence. 121 Ark. 309; 102 *Id.* 232; 8 R. C. L. 1032; 75 Fed. 480; 38 Mich. 238; 37 N. Y. S. 757; 82 N. E. 881; *Ib.* 395; 24 N. E. 622; 24 S. E. 928; 64 N. W. 25; 33 So. 902; 87 Ark. 148; 20 R. C. L. 588, 591, etc.

Natural love and affection is a sufficient consideration between mother and daughter. 106 Pac. 857; Central Law Journal, April 2, 1920.

HUMPHREYS, J. This suit was instituted by appellants against appellee in the Pulaski Chancery Court to cancel deeds executed by appellants to appellee, conveying an undivided two-thirds interest in the west half of lots one and two in block seventeen in Pope's Addition to the city of Little Rock, Pulaski County, Arkansas, on the ground that they were procured by appellee from appellants through undue influence.

Appellee filed answer, denying that the deeds in question were procured by her through undue influence, but,

on the contrary, were executed by appellants freely and of their own accord with a full understanding of all the facts.

The cause was submitted upon the pleadings and evidence, which resulted in a decree in the chancery court, dismissing the bill of appellants for want of equity. From that decree, an appeal has been prosecuted to this court, and the cause is before us for trial *de novo.*

The facts, in substance, are as follows: John D. Shackleford and his wife, Ada B. Shackleford, appellee herein, had not lived together as husband and wife for several years prior to the purchase of the property in litigation by John D. Shackleford on October 13, 1911. He roomed with and cared for their two boys, John M. and Bill, and appellee roomed with their daughter, Ada Mae, and looked after all of them. At the time of the purchase of the property, it was Shackleford's intention that his two children, appellants herein, should have the property. A settled hatred existed between Shackleford and his wife. He procured a divorce from her, without contest, on June 28, 1915. At that time, the property in question and his farm were encumbered in the same mortgage for a large sum. A property settlement was arranged, by which the appellee received the income from the home, or property in question, and was to pay Shackleford $25 per month to assist in meeting the interest payments on the mortgage. Appellee failed to meet her monthly payments and requested the mortgagee to foreclose, planning to buy the home place in at the sale. Before suit in foreclosure was commenced, Shackleford arranged a loan, placing the city home and farm under separate mortgages. The home place was mortgaged for $4,000 to a building and loan association. Appellee had fallen behind $350 on her property settlement contract. Shackleford, who had remarried, desiring to assist his children, then approaching their majority, in such way that his former wife could not reap any benefit therefrom, after considerable negotiation, conveyed the home place, September 25, 1917, to

appellants and appellee jointly, on condition that appellee, pay him $350 she owed under the original property settlement contract and assume the building and loan mortgage on the property. The value of the property was about $10,000 or $12,000 at the time the deed was executed. Appellee accepted the deed and assumed the mortgage under the advice of her attorney, who, at the time, advised her to get a deed from appellants before she put all her money into the place, suggesting that she might have to borrow money on the property, in which event, unless she did obtain such a deed, it would be necessary to get the children's consent, and that it was advisable any way, as she did not know what might happen. Ada Mae had attained to the age of 18 on August 26, just prior to the execution of the deed, and John M. reached his majority on November 20, thereafter. Ada Mae had resided continuously with her mother, and John M. also made his home with her, except when away at school, the training camp at Leon Springs, Texas, and in France. Both of them had been in sympathy and aligned themselves with their mother during the trouble which culminated in a divorce, and remained loyal to her until a short time before bringing this suit. John M. advised with his mother in the matter of divorce and to some extent in the property adjustment which resulted in the conveyance of the property in question by John D. Shackleford to them jointly. Appellee procured a quitclaim deed from Ada Mae to her undivided interest in said property, in the consideration of love and affection, on the 13th day of October, 1917, who was, at the time, residing with her; and from John M. to his undivided interest therein for the same consideration on the first day of December, 1917, while he was on a flying visit to her from the camp in Texas. He had resided in the home with his mother before going to the camp. Both deeds were executed by appellants without independent advice. The deed from Ada Mae was prepared by appellee's attorney in his office and executed immediately in a nearby notary's office. The deed from John

M. was prepared by himself on a blank warranty deed form procured by him in a down-town abstract office, and signed at home with directions to appellee to take it to a notary and have him fill out the acknowledgment.

Ada Mae testified that her mother possessed a violent temper, dealt harshly with her to such an extent that she had to do whatever her mother wanted her to; that she executed the quitclaim deed to her undivided one-third interest through the persistent entreaties and undue pressure of appellee, continuing daily through a period of about two weeks; that her entreaties partook of the nature of begging or pleading, crying and manifestations of anger; that she said her lawyer advised the execution of the deed, that John M. thought it right and was going to give his interest to her when he came home, that she was keeping up the taxes, repairs and paying off the mortgage, that she cared for her when her father kicked her out, that unless she made the deed she would not be treating her right, and that a refusal to execute it would show that she was under the influence of her father. She denied that she had stated to any one that she had voluntarily executed the deed, but, on the contrary, said that she would not have executed the deed of her own volition. She also testified that she heard most of the conversation between her mother and brother concerning the deed he executed to her, and that the understanding between them was that he should have his interest back when he came home from France; that, when he returned from France, appellee refused to make a deed conveying the property back to them, saying that if we got the property back, it must be through the courts.

John M. Shackleford testified that appellee, his mother, was accustomed to weeping and begging to prevail upon him and his sister to do things they would not otherwise do, and, when she commenced crying and carrying on, she could always get them to do anything she willed; that he came home from the camp at Leon Springs, Texas, on a visit to his mother, arriving at 10 o'clock p. m., November 30; that the next morning his mother urged

him to execute a deed to her for his interest in the property, assigning as a reason that he was going away to war and might never return; that, in case of his death, his father would inherit his interest and give her trouble; that, knowing it was the only patrimony he was to get from his father, he was reluctant to convey it away and resented the suggestion of his mother; that she began to weep and entreat, saying: "Yes, you will; yes, you will; I am in a position I have to have it;" that she continued to cry and beg until he saw no way out of it and yielded on condition she would convey his interest back to him when he returned from France; that he went to France soon afterward, returned in July, 1919, and, desiring to marry and engage in business, first requested, then entreated his mother to reconvey his interest to him, which she refused to do on the ground that his demand was inspired by his father; that he explained his father had nothing to do with it, but that he wanted the property back because it was his and he needed it, all to no avail.

Ada B. Shackleford, mother of appellants, testified that her attorney advised her to accept the joint deed from her former husband, John D. Shackleford, to the property in consideration that she pay him $350 in cash and assume the payment of the $4,000 mortgage thereon, if she had confidence in her children, the appellants, who were to receive, under the same deed, an undivided two-thirds interest in the property, unencumbered; but also advised that as she was going to put all her money in the property, it would be best to get a deed from them, conveying their interest to her; that she communicated the advice given her by her attorney to Ada Mae and asked Ada Mae what she thought about it; that Ada Mae told her it was all right, that she should have had the property from the beginning; that nothing more was said about the matter until they went to the attorney's office to execute the deed; that, before going, she told Ada Mae they had better go down and get it off their hands; that Ada Mae was in a happy mood and perfectly willing; that her at-

torney asked Ada Mae if she knew what she was doing and Ada Mae responded she did; that, after the deed was prepared, they walked across the hall to a notary's office, where Ada Mae signed and executed it; that she paid nothing to Ada Mae for it; that she was of opinion that John M. felt as Ada Mae did about it; that she wrote to him concerning the matter and he answered that when he came home they would talk the matter over; that when he came home, they did talk the matter over and he said, "Mother, that is all right, that is the best thing we can do;" that he remained a day or so, went to Fayetteville, and, when he came back, they talked over his trip to France; that, just after dinner, he started to town, at which time, she requested him not to forget the deed he was going to sign; that he said "All right," sat down and wrote it out and signed it at the dinner table; that, after signing it, he remarked that if his father knew that he had conveyed the property to her, he would turn over in his grave; that he instructed her to take it to A. Letzkus, who would acknowledge it; that, in accordance with instructions, she took it to Letzkus and then had it recorded; that she paid her son nothing for the property; that, before she obtained the deeds from her children, she paid $350 she owed her husband, and $1,000 on the mortgage indebtedness, and had since kept up the interest payments thereon; that, after obtaining the deeds, she expended $1,000 in improvements on the property and had collected and used the room rentals; that, while in France, John M. wrote a letter in which the following paragraph appears: "No, I have not heard a word from Dad in regard to the transaction between you and I concerning that place, and I don't expect to, either. I think he understands that I knew what I was about, although nothing has been mentioned about it. That is a matter, though, that will be adjusted between he and I when we see each other. I am perfectly satisfied, though, so he can not disagree. You are looking after the place, so that is all that is necessary. I have not forgotten by any means that you are my mother, and that we are per-

fectly congenial and understand each other better than those who have broken their ties of relationship. We will take care of that proposition, so don't worry. We are looking out for each other's interest—so we are satisfied;'' that when her son returned from France in July, 1919, her son demanded a reconveyance of an undivided one-third interest in the property, insisting that it was so understood at the time he conveyed it to her; that he admitted nothing was said to the effect that she should reconvey it to him, but that he understood it that way; that she claimed there was no such understanding and refused to reconvey the property to the appellants. Appellee further stated that her reasons for wanting the deeds from her children were that, if she wanted to borrow money or make improvements, she did not want to ask them about it, and in order to prevent their father from influencing them to lose it.

Eva Shackleford testified that, after John M. returned from France, she heard a conversation between him and his mother, in which he claimed he had deeded it to her so that she, and not his father, might get it in the event he was killed, and that it was his understanding he was to have it back, whether anybody else understood it or not. His mother asked him how he could understand it that way when nothing was said about it, and he replied that he understood it that way, whether anybody else understood it or not. She also testified that, after the institution of this suit, she heard Ada Mae say that she deeded her property to her mother of her own free will and accord.

Mrs. H. B. Johnson testified that she was rooming at the house and Ada Mae came to the room, and, while there, told her she had given the place to her mother; that it was her mother's place to have it and that she did not want it; that, after the suit was instituted, she told her that ''we want the place in our names, so if anything comes up we can use it,'' and, in that connection, said her father had told her in case the place was deeded back to her, he would see that her mother always had a home.

Evidence was introduced pro and con to show that after John D. Shackleford discovered that the children had deeded their interests in the property to their mother, he offered Ada Mae $1,000 to get her to deed it back. John D. Shackleford's explanation in this regard was that he offered to bet his daughter $1,000 she could not get her mother to deed it back, at a time when his daughter claimed that the mother would deed her interest back to her at any time she wanted it.

The record is voluminous and contains much evidence not attempted to be detailed in this opinion. An attempt has been made to glean such evidence only from the record as is responsive to the issue of whether undue influence was used by appellee in procuring the deeds in question from appellants.

The standard governing transactions between parents and children who have recently attained their majorities is a high one. This court said, in the case of *Giers* v. *Hudson,* 102 Ark. 232 (quoting syllabi 1 and 2), that: "Where a daughter, though of age, remains under her father's roof, any contract, conveyance or business transactions between them will be closely scrutinized by the courts." "A conveyance from a daughter to her father, made while she lived with him, will not be permitted to stand unless the transaction is characterized by the utmost fairness and good faith on the father's part." In that case, the language of Lord Chancellor Cranworth in the case of *Savery* v. *King,* 5 H. of L. Cases, 627, was approved as accurately stating the controlling principle in this class of cases. The language of the chancellor was as follows: "The legal right of a person who has attained his age of twenty-one to execute deeds and deal with his property is indisputable. But where a son, recently after attaining his majority, makes over property to his father without consideration or for an inadequate consideration, a court of equity expects that the father shall be able to justify what has been done; to show, at all events, that the son was really a free agent, that he had adequate independent advice, that he was not taking an imprudent

step under parental influence, and that he perfectly understood the nature and extent of the sacrifice he was making, and that he was desirous of making it.'' It follows from this language that the burden rests upon the parent in this class of cases to clear the transaction of every shadow of suspicion and to establish its fairness and good faith. The conveyances in the instant case were donations. No consideration was paid for them. They in no way benefited appellants. It is not contended that the consideration was other than love and affection. Such a consideration is sufficient to uphold conveyances, if thoroughly understood and voluntarily made. The conveyances were made only a short time after appellants attained their respective majorities and while they remained under the mother's roof. Ada Mae had never resided elsewhere, and John M. only when away at school or in a soldiers' training camp. The mother had been advised not to assume the indebtedness or make improvements without first obtaining a deed from her children. She wanted the deeds so that she would not have to consult them in case she wanted to borrow money or make improvements on the property, and for the additional reason that she did not want her husband to control or influence the children in the control or disposition of their undivided interest in the property. She communicated the advice she received from her attorney to each of the children and requested them to make deeds to their undivided interest to her. They received no independent advice concerning the transaction. The only advice or counsel they had was that of the mother. They both swear that she obtained the deeds through undue influence exercised over them by continuous entreaties accompanied by weeping; that, in making the deeds, they yielded unwillingly to the overpowering influence of their mother. She denies their statements, but has no corroboration save that of two witnesses who testify that Ada Mae had told them she voluntarily gave her interest in the property to her mother, and that John M. admitted no definite promise had been made by appellee to deed

the property back to him, but that it was only his understanding at the time. Appellee's testimony thus slightly corroborated, when viewed in the light of appellee's admission that she had been advised to get a deed from them to the property and that she wanted and asked them for their several interests, is not sufficient to overcome the positive evidence of appellants that they were induced to make the deeds through the constant entreaties and weepings of their mother. The letter written by John M., while in France, to his mother, does not necessarily indicate that he had irrevocably conveyed his interest to her. The letter contains expressions indicative of a contrary purpose, viz: "You are looking after the place, so that is all that is necessary." "We are looking out for each other's interest—so we are satisfied."

For the error indicated, the decree is reversed and the cause remanded with directions to cancel the deeds in question, and for such further proceedings as may be necessary to adjust the equities between the parties not inconsistent with this opinion.