Angelia M. GROSS, Appellant,

v.

Marian E. GROSS, Respondent.

No. WD 31902.

Missouri Court of Appeals,
Western District.

Nov. 24, 1981.

Cornelius Roach, III, Kansas City, for appellant.

Joseph H. Moore, Hentzen, Moore & Willy, Kansas City, for respondent.

Before KENNEDY, P. J., SOMERVILLE, C. J., and SHANGLER, J.

SHANGLER, Judge.

The plaintiff Angelia Maria Gross, beneficiary of an express trust, brought suit against the trustee, her mother Marian Gross, for breach of trust and for a declaration to enforce the trust. The trustee denied any breach of fiduciary duty and by affirmative answer asserted that the beneficiary made a gift to the trustee [mother] of the trust proceeds. The case was tried to the court and the trustee mother had judgment.

The beneficiary Angelia was born on January 22, 1959. In her infancy, the parents—then still of one household—undertook to provide for the education of the child by a special bank account with the parents as joint trustees. In some fashion, the repository bank applied the funds as

credit against the overdrawn account of father Isadore Gross, and Angelia [by the mother as next friend] sued to recover the trust money. The federal court ordered the bank to restore to the infant the sum of $10,022.76. The decree then directed that the judgment money [less a $2,551.30 attorney fee] be transferred to Waddell & Reed, Inc. for investment as an irrevocable trust, to be used *solely for the education of Angelia Maria Gross*, according to the form of the declaration approved by the court and appended to the order.[1] The effect of the judicial order was to settle upon the infant Angelia, then eight years old, the benefit of a $7,393.13 fund for her education, held for that irrevocable purpose by the mother as trustee. The funds were invested by attorney Francis Roach, counsel for the minor and her next friend, as prescribed by the court order.

The approved irrevocable Declaration of Trust form recited the provisions:

I, the undersigned, having purchased stock issued by the United Funds, Inc.,— Accumulative Fund, and having directed that . . . said stock be issued in my name as Trustee . . . for the benefit of Angelia Maria Gross, do hereby declare that the terms and conditions upon which I . . . shall hold said stock and the proceeds thereof . . . are as follows:

\* \* \* \* \* \*

3. *[T]his trust shall* end and *terminate when the trustee* or successor trustee *shall have determined that the beneficiary's education is complete or that she has received all the education that she desires to take, at which time the unused*

*balance of the trust shall be delivered to the beneficiary.*

4. *The trust shall be irrevocable and the trustee shall have no power* to modify or amend the trust except as heretofore set out or *to appropriate any portion of the principal or income to his or her own use or benefit.* [emphasis added]

The instrument was marked for the subscription of *Marian E. Gross, Trustee for Angelia Maria Gross, a minor.*[2]

The federal court judgment was affirmed on appeal, the money paid, and shares in an accumulative fund purchased with the $7,393.13 net proceeds in March of 1967 on an open account with Waddell and Reed in the name of the mother as trustee under a declaration of trust for the benefit of daughter Angelia. The dividends were reinvested from March of 1967 through March of 1977 and the trustee received the periodic reports of this activity from the management of the fund. In that interim, no money was withdrawn or expended from the fund for any purpose. Then on March 23, 1977, the trustee mother liquidated all the held shares in the accumulative fund and received a check for $7,615.60 payable to the order of *Marian E. Gross, Trustee [under declaration of trust dated 3/10/67] for the benefit of Angelia Maria Gross.* The beneficiary Angelia was then eighteen years of age.

In year 1974 the parents became estranged and the following year the marriage ended. The custody of the children Angelia [then sixteen years of age] and Isadore III was granted the mother and the father was assessed for their support. Angelia remained at the maternal resi-

---

1. The litigation is reported by Memorandum of Decision in *Gross v. Douglass State Bank, et al.*, 261 F.Supp. 1002 (D.C.Kan.1965). The parties agree that the form of the irrevocable declaration of trust is as adjudged by the federal court order.

2. The original instrument was lost and so not available as evidence. The information to the court was that counsel Roach delivered the trust device to the United Funds at the time shares in the accumulative mutual fund of the investment company were purchased with the judgment money in accordance with the order

of the federal court. The original instrument was not found among the files of counsel nor among the records of the investment company. The trustee—as we develop in the course of opinion—denies execution of the trust instrument or knowledge of its contents. To that extent, the absence of the original evidence bears on the issues. The counsel for the minor Angelia [the beneficiary] and for the next friend [the mother trustee] at the federal court proceedings and thereafter was since stricken and was unable to appear at the trial of the suit we review.

dence. She trained as a keypunch operator and in June of 1977 was graduated from high school. Then she completed an abbreviated course as a calculator operator in Pioneer Community College in January of 1978. Angelia was then nineteen years of age. She became fully employed as a key punch operator on November 21, 1977, and since then has been her own support. Angelia left the maternal household on January 12, 1978, and never returned. On March 10, 1978, counsel for the beneficiary Angelia made written demand on the mother as trustee to pay over the $7,615.60 proceeds from the sale of the trust account shares. The trustee mother refused compliance and suit ensued.

The trial court gave judgment to the trustee mother on the determination that the beneficiary daughter, by then *sui juris*, disclaimed the fund and made a gift of those proceeds to the mother. In the course of the formulation of judgment, the court assessed the contentions of the protagonists, the credibility of the witnesses, discoursed on the legal effect of the transactions between the principals and adjudged that the beneficiary proved no breach of trust and that the trustee acquitted her burden to prove right to the fund by gift. The pronouncement of the court of the grounds for decision, however, was an opinion not formally requested by a party so that, even if erroneously found, does not invalidate the judgment. *Prudential Property & Casualty Ins. Co.*, 586 S.W.2d 433, 435[4] (Mo.App. 1979). In such a case the general judgment itself is the basis for review. In that exercise the court on appeal sustains the result on any proven theory and to that end accepts as true the evidence favorable to the judgment and discards the evidence in contradiction. *S. G. Adams Printing v. Central Hardware Co.*, 572 S.W.2d 625, 627[1] (Mo. App.1978).

The imminence of the dissolution of the marriage in year 1974 gave occasion for discussion among the mother and children.[3] The mother enlisted the advice of the children as to a divorce and how to maintain the family in that eventuality. Angelia, for whatever reason, was not questioned on that episode, but her solicitude for the reduced circumstances of the mother upon a divorce was described by other family members.

The brother, Isadore III, testified that the children were aware that a family rupture impended and talked with Angelia [then about fifteen or so years of age] about that concern. Angelia complained that the father had "done her wrong" and "taken advantage of her and deprived her of her allowance money," and that she would reside with her mother in the event the marriage dissolved. They spoke of the trust fund for her education. Angelia told Isadore she did not intend to continue her studies after high school [where they both attended] because she was constantly in trouble there. Angelia expressed that she wanted to make a gift of the trust fund to the mother because: "she felt we were in a financial pinch and she thought it would be best that she turned it over to my mother saying that my mother was the only concerned parent at the time." Angelia told brother Isadore that during the parental separation, the father refused her funds for clothes and would have nothing to do with her. The half-sister Julietta also discussed with Angelia the implications of a parental divorce. Julietta was then on the faculty of the State University of New York and lived away from the home with her husband. They discussed that brother Isadore was in attendance at Iowa University and could be of no help to the mother. They recalled that the mother had never been employed and were vexed as to how the family would manage. They spoke of the trust fund as the resource for the continued education of Angelia, but Angelia expressed that she had

---

**3.** The children of trustee Marian Gross included not only Angelia and Isadore III, offspring of the marriage with Isadore Gross, but also Julietta—half-sister to Angelia and Isadore III. The family consultations included at times Jimbo, [then] husband of Julietta. The family residence during the relevant years 1977 and 1978, however, was occupied only by Angelia and her mother.

no wish for more school but would rather remain at home with the mother. Angelia [then sixteen years of age] insisted recurrently: "I want Mama to have the money to do with as she sees fit." Then in year 1977 after the divorce [Angelia was then eighteen years of age], Angelia visited Julietta in New York for several weeks. In that interim, before the mother and brother Isadore joined them, Julietta probed Angelia seriously about her intention for further education. Julietta reminded Angelia that she had facilitated entry of the brother Isadore into Iowa University, her own alma mater, and that she could assist Angelia as well to enter either Iowa University or the university in New York where she instructed. Angelia responded that she did not care for school, "she was having problems at [the high school] and she just really wasn't interested in school." Julietta reminded Angelia that the trust fund money was available for education, whether by formal college curriculum or by the advancement of the business instruction Angelia already commenced. Angelia responded: "No, I don't want anything to do with it. This money, Mom can use it as she needs it more than I do. I can work." The narrative of the mother trustee was to the same effect. As the divorce loomed more certainly, the children were drawn into concerns for their care since the mother was not trained for employment. In the midst of the family discussions, Angelia, more than once, said: "Mom, remember when I get 18, you've got that money"[4]—"Mom, that is yours. Do whatever you want with it." That was, the mother explained, because Angelia knew "whatever she needed, I would provide." Then, after the dissolu-tion became actual in year 1975, Angelia, aware of the fiscal predicament of the family—Isadore III was in attendance at a private high school and then in matriculation at Iowa University, Angelia was in her own course of study, the family was without savings, or necessary insurance coverages [by the account of the mother]—iterated to the mother: "Well, Mom, you don't have to worry about it. When I get 18, you have got that money"—and again—"Mom, this was never my money. It's always been yours. You do with it what you want to do."[5]

The family practiced a tradition to forgather at Christmas. It was a time of thanksgiving for the year just past and for each to share with the other the expectancy for the year ahead. The year 1976 Christmas family assembly was at Iowa City where Isadore III attended and Julietta was still enrolled. Angelia, Isadore III, Julietta and her [then] husband Jimbo were together with the mother. There was a discussion of the future for Angelia, whether she would continue into college instruction. They all encouraged that course. [The mother had already paid down a deposit on her behalf to the University of Missouri at Kansas City, an overture that never materialized.] The children and mother suggested Iowa University. They reminded Angelia that the trust money was for that purpose. To this she responded [the mother testified]: "Mom, this is your money. You can do with it what you want to. I appreciate what you are doing, but this is for all of us." The next Christmas, in year 1977, the family convened at the residence of the mother. Once again, the children and mother discussed the future.

---

4. The notion became fixed, both with the mother and daughter Angelia, that at age eighteen, Angelia was unconditionally entitled to the trust fund corpus. That impression was the apparent consequence of a telephone conversation between the trustee mother and attorney Roach for advice concerning the nature of the trust and her role and whether she should have some "kind of papers" on the mutual fund investment in her hands. Counsel Roach—according to her testimony—told her: "I would have to look that up, and I will let you know. But as far as any papers, don't worry about it until Angelia gets 18." The evidence does not suggest that the attorney, at later date, supplied the advice the mother sought about "how it [the investment trust] worked."

5. The dissolution adjudication also ordered the custody of Angelia and Isadore III to the mother and awarded the sum of $250 per month per child for support, among other provisions. The support obligation as to Angelia was terminated in February of 1978 when she was judicially adjudicated emancipated.

And once again the mother brought up the subject of continued education for Angelia—perhaps at Iowa University where Isadore III and Julietta were enrolled. Isadore III testified that Angelia [by then eighteen years of age] "broke out in tears because she said she did not want to leave home and leave my mother alone, and she wanted to continue to work, to stay there in the house with my mother." Then, when the mother made clear that the trust fund was for that purpose, Angelia replied: "Mother, I would much rather see you take this trust fund as a gift from me to you to pay your bills, because I know Daddy is not helping us out like he should be. He is skipping his responsibilities." The mother recounted that on that Christmas event when the subject of the continued education for Angelia came up, she suggested her daughter attend a school away from home as the other two children had done, but Angelia did not want the mother to be left all alone. Also, Angelia preferred to continue her computer courses at the Pioneer Community College because "there was more money in that." The sister Julietta, also at that holiday event, spoke privately with Angelia about college, and the trust fund resource came into the conversation—as usual. Angelia answered—also as usual—"No, I do not, you know, want to go." Then at the traditional ceremony that Christmas, Angelia got up before the family company and said: "We have talked about this time and time again and I do want everybody to know, and especially Mama, that this money that is in the trust fund, you know, for me—I am not going to go to school with it, you know, to continue my education, and I want her to have it, and whatever she wants to do with it, I feel is fine." The sentiment was expressed [so it struck Julietta] "in such a way that it was kind of like, this is my Christmas gift to you." [As we note, by then Angelia was eighteen years of age.]

There was another episode of discussion between Angelia and her mother reported by brother Isadore III. On that occasion [during the 1976 Christmas family event,[6] according to Isadore III] when the trust fund was under one of the recurrent discussions, Angelia told the mother the fund should be placed in separate accounts to each of the three children—as the money was to the mother as a gift. [There was intimation in his testimony that the suggestion by Angelia for the separate accounts was merely a response to a conversation with the mother that the fund could be administered more conveniently in that manner "if anything happened to her [Angelia.]"[7]

Angelia was estranged from the mother at the time of the suit. The cause was in dispute. Angelia testified that the mother cast her out of the house on January 12, 1978—ten days before her nineteenth birthday—when, after a visit to the father the week before, she asked her mother about the trust fund. The mother, according to Angelia, angrily told her "my father didn't leave any mutual funds . . . she got very mad at me and told me I had to get out." The mother described the event differently: She had just completed a drive to Iowa to deliver Isadore III at the school when, the next morning, without warning Angelia told her mother simply: "Here's the keys to your house. Here's the keys to your car. I am leaving. In fact, I have already moved." The mother asked why and Angelia responded: "I don't like to go to school. I am not going to school, and I am moving . . . I am not ever coming home. I don't need you for nothing. I don't owe you nothing. You don't owe me nothing."

Whatever prompted the departure, Angelia had reconciled with her father only shortly before the disruption with the mother after years of alienation. It was only then, on the January 6, 1978, visit with the father, that she learned of a trust fund for her education. Angelia testified, not only

---

6. The testimony of brother Isadore III intermingles years 1976, 1977 and 1978 and so renders the references less than precise.

7. Three savings accounts were, in fact, established in March of 1977 from the trust fund proceeds as the chronology of events shows.

that she never knew of the trust fund, but that she did not know that in March of 1977 the proceeds were withdrawn and reconstituted into three separate savings accounts. She denied any discussion with the mother as to college enrollment until after she took her high school degree in June of 1977—when she asked to enroll at Iowa University where Julietta and Isadore III matriculated—but was told that the father provided no money for that purpose. She denied any family tradition at Christmas time, except to gather together; denied any discussion of educational or other plans on such an occasion; denied a separate conversation with brother Isadore III or half-sister Julietta about college enrollment; denied the visit to Julietta in New York [then joined by the mother and brother]; denied a conversation with brother Isadore III about the trust fund as the source for the cost of any continued education, and had no recollection of the events of the year 1977 family Christmas. The mother never mentioned the trust to her, nor explained to her the Declaration of Trust, nor informed her of the federal suit which established the trust, nor the sum adjudicated and paid, nor displayed to her any of the m.itual fund reports. [There was evidence from a nonfamily witness—Massey—however, that he knew Angelia since childhood and on at least three occasions he was present when the family members and Angelia discussed the trust fund. These discussions, the witness recalled, were before the divorce when Angelia was about sixteen years or so of age.]

The father Isadore Gross related the January 6, 1978, conversation with daughter Angelia at his office. He asked why she was not going to Iowa University, as were Isadore III and Julietta, to which Angelia responded that the mother had informed her the father had not provided for that purpose. The father then told Angelia of the trust fund established for her education in year 1966—and that he, her father, "was the one that put the fund in there for her." [8] The father later conducted her to the office of attorney Roach to assure her there was an actual trust.

Angelia, from after the January of 1978 breach with the mother, provided entirely for herself from a steady employment. Even before, Angelia worked intermittently for gain during and after completion of the high school credits in March of 1977 at the age of eighteen years. In one interim, from January to June of 1977, she paid the mother $65 per month for board and telephone expense. That stint of work was curtailed by illness which required hospital treatment. The mother paid that expense. Then, that winter, she resumed work and concurrently took technical courses at the Pioneer Community College. The mother paid $42 for the tuition and purchased for Angelia an inexpensive car for those purposes. The mother, herself, in the interim after the dissolution of marriage in year 1975—otherwise dependent altogether on the remittances by the father under the decree for the family support—made some earnings at home as an upholsterer.

Angelia turned eighteen years of age on January 22, 1977. Sometime after that event, the mother trustee telephoned counsel Roach to inform him that Angelia was of that age and asked whether she needed "any papers to cash it [the fund] in." The counsel advised the trustee simply to telephone Waddell and Reed for a check. She was surprised to learn, contrary to expectation, that the fund amounted to only somewhat over $7,600 [$7,615.60]. [9] The mother reported to Angelia that the amount "is not what it's supposed to be" to which [by

8. The assessment of that self-bestowal is scarcely relevant to either the determination of the essential facts and principles of law essential to decision. The tenor of the report of the federal court proceedings [*Gross v. Douglass State Bank*, 261 F.Supp. 1002, l.c. 1004 (D.C. Kan.1965)], however, more than suggests that it was *the mother* who insisted the funds be kept inviolate for the education of Angelia, and it was the mismanagement by the father which resulted in the misuse by the bank and the resultant litigation, judgment and imposition of a judicial trust on the recovered funds.

9. The original trust fund investment on January 7, 1966, eleven years earlier, was $7,393.13.

account of the mother] Angelia replied: "I don't care what you do with it." The mother then expressed the intention to liquidate the fund for deposit in the bank where "at least it will draw some interest." Angelia [again, by the account of the mother] made the response already noted: "Like I said, I don't care what you do with it. It's never been my money anyway." The mother then liquidated the fund shares in March of 1977, was remitted the $7,615.60 by a check payable to herself as trustee under the declaration of trust for the benefit of Angelia and within days transferred $7,000 of the sum into three separate savings accounts. One account for $2,500 was in the name of Angelia and the mother. One account for $2,500 was in the names of Julietta and the mother. And still another account for $2,000 was in the names of Isadore III and the mother. The remainder $615.60 was used by the trustee for Angelia and for their visit to Isadore III in Iowa. A portion of that remainder—about 20% of that sum—was used to pay bills. The trustee mother informed Angelia [then eighteen years of age] of the deposit transactions and [according to the mother] the daughter replied: "Mom, like I said, I don't care what you do. It's yours," The mother then also disclosed to Angelia where the account books were kept so that "if anything should happen to me, well then, you and Dickie [Isadore Richard III] and Julie will know where you can get ahold of it right away." Angelia acknowledged she knew of these accounts, but not the source of the funds or that she was a designated owner of an account.

The mother withdrew $500 from the Julietta-mother account on October 4, 1977. The mother withdrew $200 from the Angelia-mother account on October 14, 1977, and deposited a like sum a week later. The accounts accrued interest in the respective amounts of $63.82, $60.76 and $51.21. The Julietta-mother account was withdrawn on November 30, 1977, and the $2,099.73 balance was deposited in the Isadore III-mother account. The funds in the Isadore III-mother account were withdrawn by the mother after November 30, 1977. Then, on

February 2, 1978, after Angelia left the maternal home [January 12, 1978] with the valedictory: "I am not ever coming home. I don't owe you nothing. You don't owe me nothing"—the Angelia-mother account was withdrawn and the $2,586.17 [plus an unexplained $900] was deposited in the Isadore-mother account. The account was thereafter withdrawn and deposited in another bank. The trustee-mother explained that the funds were used to pay for the year 1977 hospital expense for Angelia [to reimburse the insurance carrier for payments not covered by the policy], for the cost of an accident incurred by son Isadore III and for his school tuition and support [by then no longer the obligation of the father], and for the hospital expenses of the mother, and for other household family matters. There remains nothing of the money.

■ The beneficiary pleads that the liquidation of the mutual funds was not only an appropriation of trust property in breach of the fiduciary duty of a trustee, but also an infringement of the confidence between a parent and child. The answer of the mother denies the continued existence of a trust, but that the funds came to her regularly as a gift from the daughter. The judgment for the trustee rests on the premise of a completed gift of the trust corpus to the mother by the beneficiary daughter. Our review assumes that the facts were found in accordance with the judgment entered. *Kenilworth Insurance Co. v. Cole*, 587 S.W.2d 93, 96[3–5] (Mo.App. 1979). A judgment which rests on less than substantial evidence, or on a misconceived declaration or application of the principle, however substantial the evidence, nevertheless, amounts to an error of law subject to redress by the court on appeal. *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976); Rule 73.01.

■ The judgment rests on the factum of gift. In the usual course, one who claims an inter vivos gift bears the burden to prove the donation by clear and convincing evidence. *In re Estate of Wintermann*, 492 S.W.2d 763, 767[1–3] (Mo.1973). In the con-

text of the pleadings, the response of the trustee mother that the proceeds of the trust investment are held as a gift amounts to an avoidance of the contention of the petition that she appropriated the funds in breach of the fiduciary duty and so constitutes an affirmative defense. Rule 55.08. The burden to prove the affirmative matter rests on the proponent of the defense. *McLeod v. Marion Laboratories, Inc.,* 600 S.W.2d 656, 657[2, 3] (Mo.App.1980). The principle applies with more rigor where the claimant of the gift was in a relationship of trust to the donor at the time the gratuity was conferred. Thus, where the donee owes the donor a fiduciary duty as trustee or a duty of confidence as parent, the burden rests on the proponent not only to prove gift by clear and convincing evidence [*Newton v. Rebenack,* 90 Mo.App. 650, 672 (1901); *Miller v. Simonds,* 72 Mo. 669, 687 (1880)], but that the transfer was absolutely fair [*Klaber v. Unity School of Christianity,* 330 Mo. 854, 51 S.W.2d 30, 31[2, 3] (1932)].[10] That essential proof entails evidence of a gift not only valid in form but also valid in fact—that is, freely intended. *In re Estate of Patterson v. Powell,* 348 S.W.2d 6, 8 (Mo.1961).

The formal elements of an inter vivos gift are three: a present intention to make a gift by a competent donor; a delivery of the property by the donor to the donee; and acceptance by the donee whose ownership takes effect immediately and absolutely. *In re Estate of Wintermann,* 492 S.W.2d 763, 767[1–3] (Mo.1973). A beneficiary *sui juris* and otherwise competent enjoys the power to confer the trust property by gift upon the trustee [*Newton v. Rebenack,* 90 Mo.App. 650 (1901); Scott on Trusts § 170.1 (Third Edition)] as does a child—become of age—upon the parent. To satisfy the fairness of such a transaction, however, a trustee who deals as a donee from a beneficiary, not less than a parent who deals as a donee from a child still under the parental shelter [albeit *sui juris*], however, owes the duty of disclosure of all the facts and circumstances within the knowledge of the trustee or parent so as to enable the beneficiary or child to deal on even terms. *Newton v. Rebenack,* supra, l.c. 674; *Street v. Goss,* 62 Mo. 226 (1876); *In re Patterson's Estate,* 383 S.W.2d 735, 736 (Mo.1964); Restatement (Second) of

**10.** The decisions sometimes express that principle by the maxim that a gift between persons in a relationship of trust or confidence is presumptively void and casts upon the putative donee the burden to prove the validity of the donation [*Skidmore v. Back,* 512 S.W.2d 223, 229[2–4] (Mo.App.1974); *In re Kaimann's Estate,* 360 Mo. 544, 229 S.W.2d 527, 530[9, 10] (1950); *Bradshaw v. Yates,* 67 Mo. 221, 228 (1877)]—and that by the usual clear and convincing quantum which governs proof of an inter vivos gift. *In re Kies' Estate,* 320 S.W.2d 478, 480[2] (Mo.1959); *Miller v. Simonds,* supra, 72 Mo. 669, 687 (1880). The presumption of invalidity rests on the concern of equity to prevent an unfair exercise of dominion over those in condition of subordination [*Klaber v. Unity School of Christianity,* 330 Mo. 854, 51 S.W.2d 30, 31[2, 3] (1932)—as of a child to a parent or a beneficiary to a trustee. It is because such a relationship is freighted with opportunity for the dominant party to exercise an undue influence that prompts the watchfulness of equity. *Bridwell v. Swank,* 84 Mo. 455, 467 (1884).

To enlist equity, therefore, needs only a show of a relationship that the inferior makes a conveyance to the superior. "[I]t is not necessary to show that fraud or imposition was practiced

upon him who bestows the confidence, but simply the existence of such confidential relations, and that during that time the conveyance was made. When this is done, the onus of showing the fairness of the transaction is on him who claims under the conveyance." *Bradshaw v. Yates,* 67 Mo. 221, 228 (1877). See also *Street v. Goss,* 62 Mo. 226, 229 (1876); *Reed v. Carroll,* 82 Mo.App. 102, 108 (1899); *Hall v. Knappenberger,* 97 Mo. 509, 11 S.W. 239 (1889); *Munday v. Knox,* 321 Mo. 168, 9 S.W.2d 960, 966[7, 8] (1928). In this developed rationale, evidence that the gift was untainted—that is, "absolutely fair"—rebuts the "presumption of invalidity" and yields the rule we follow. *In re Patterson's Estate,* 383 S.W.2d 735, 738 [1, 2] (Mo.1964). In circumstances—such as here—where the responsive pleading sets up the factum of gift to avoid the petition allegation of breach of trust and confidence—the proponent of that affirmative avoidance bears not only the procedural burden on that issue [*Cuthbert v. Heidsieck,* 364 S.W.2d 583, 587 (Mo.1963)] but the substantive burden of nonpersuasion as well. MAI 3.04 (1981 Third Edition); *In re Passman's Estate,* 537 S.W.2d 380 (Mo. banc 1976). *Michaelson v. Wolf,* 364 Mo. 356, 261 S.W.2d 918, 924[5, 6] (1953).

Trusts § 170(2) (1959); Restatement of Restitution § 190; Scott on Trusts § 170.1 (Third Edition); 76 Am.Jur.2d, Trusts § 322 (1975).

A person eighteen years of age has capacity to contract [§ 431.055] and so, by parity of principle, to make a gift. *Walker v. General American Life Insurance Company*, 141 S.W.2d 785, 787[5, 6] (Mo.1940). The judgment for the trustee rests on the premises that the beneficiary Angelia, then eighteen years of age, made a gift of the trust corpus to the trustee, a donation delivered by the daughter and accepted by the mother by the withdrawal of the accumulated mutual fund. The beneficiary contends on appeal, however, that the formal elements of gift were not proved—so that the trustee failed on the affirmative issue that she holds the trust funds as a donee of the beneficiary—but rather, that the evidence raises an inference that the property came to her unfairly—by a want of disclosure to her by the trustee of the terms of the trust, by mistake and other fiduciary lapses—an inference unrebutted, so as to entitle the beneficiary to restoration of the fund.

Angelia came of age on January 22, 1977. The rationale of judgment was that the beneficiary was without capacity to confer a valid gift inter vivos until that event. The beneficiary argues that the statements attributed to her during nonage to the effect: "When I get 18, you have got the money"—and—"I don't want this money; you take it," and the like, were only promises for a future gift, and so unenforceable, and can neither form the basis for the judgment of gift by a donor *sui juris*. The beneficiary contends even more: that the statements made in infancy of an intent to disclaim the fund do not aid to prove an intent to make a gift formulated after majority, and, deprived of that evidence the judgment for the trustee does not stand. We agree with the beneficiary that a valid gift entails an irrevocable transfer

of a *present* interest [*Smith v. Smith*, 192 S.W.2d 691, 698[6–9] (Mo.App.1946)] and that any promise by Angelia during nonage to release the trust fund as a gift upon majority was without effect. The judgment, however, does not enforce a gift promised in infancy but deferred until majority. The adjudication rests rather on evidence of declarations of a present gift by Angelia, delivery to the mother and acceptance *after* the beneficiary—then still resident with the mother and still disinclined to instruct after high school and sympathetic to the family straits—reached eighteen years. The mother again telephoned attorney Roach, as he counselled earlier when Angelia became of age, to inquire whether documents were necessary to liquidate the Waddell and Reed fund. The attorney responded [by her testimony—which we assume as true for this treatment] that no papers were needed but simply to call Waddell and Reed and "tell them, send you out a check. It's as simple as that." The mother made the inquiry and reported to the daughter: "Angelia, this money was supposed to have been more than this." The mother informed the daughter the fund amounted to only "7,600 and some odd dollars." [The mother had expected an accumulated $20,000 or so because of the prolonged investment term.] Angelia replied: "Mom, I don't care what you do with it." The mother told the daughter: "I am going to cash it in and put it in the bank. At least it will draw some interest." And Angelia said: "Like I said, I don't care what you do with it. It's never been my money anyway." The mother then telephoned Waddell and Reed and requested a check for the fund. The remittance was received by the mother, negotiated and deposited in three separate savings to the accounts of Angelia, Julietta and Isadore III, each named as owner with the mother. The accumulated fund was closed on March 23, 1977. The three accounts were opened on March 25, 1977.[11]

11. The admissions show that the fund was liquidated on March 23, 1977. The exhibits show the separate accounts were established on March 25, 1977. The questions by counsel to the trustee intermingle the dates and the court

The judgment found that the event established a valid inter vivos gift by Angelia to the mother. We find that the evidence taken favorably to the judgment, sustains the elements of a valid gift. A finder of fact could determine that the declarations by Angelia, then *sui juris*, disclosed an intent to pass a present interest in the fund to the mother irrevocably at the time uttered, that the intention to transfer by gift property already within the power of the mother amounted to a delivery, and that the contemporaneous withdrawal of the funds by the mother was an acceptance.

■ To confer a gift needs no special words: it is necessary only that in the context of circumstances the intent to give becomes manifest. *Smith v. Smith*, 313 S.W.2d 753, 756[9, 10] (Mo.App.1958). The words: "That's yours" suffices to demonstrate a present intent to make a gift where such an intent is consistent with the previous conduct of the donor. *In re Estate of Hoffman*, 490 S.W.2d 98, 102 (Mo.1973). The evidence of the recurrent statements by Angelia during nonage to donate the trust fund at age eighteen to the mother to relieve the family plight bears—not as a promise for a gift, and so unenforceable, as the beneficiary contends—but as an expression of an intention to make a gift upon majority and renewed at the age of legal capacity as a donation presently intended. That evidence bears even beyond, to show that the beneficiary was aware of the trust fund [a fact Angelia insistently denies], that she foreswore that resource for educational purposes, and that the motive to transfer the fund by gift to the mother was concern for the dire needs of the family—a natural love and affection—and so uninfluenced and free of unfairness.

The beneficiary contends nevertheless that a gift failed for want of unequivocal acceptance by the trustee. The beneficiary argues that the withdrawal of the trust account consequent to the words of gift of the fund by Angelia after her eighteenth birthday and the establishment of the three separate accounts with the proceeds notwithstanding, the testimony of the mother and others on her behalf—before and after that event—that the $7,000 allocated to the three accounts was still "trust" money for Angelia rendered the acceptance inconclusive so that the intent of the donor was not consummated. The sense of the evidence upon which the judgment of gift rests is that Angelia looked to the trustee mother as the family provider—in default of that role by the father—and since she was without interest in further education, Angelia donated the fund to the mother for the family purpose. That was the "trust" [12] with which the mother kept faith. To that end, the mother established three separate accounts with the proceeds of gift, one *in the name* of *each child* conjointly with her own—and those without any formal designation of "trustee." That the money was accepted unconditionally as a gift and used for the purpose conferred—the *family* needs and not for Angelia alone—is shown by the expenditure of the $615.60 of the trust fund proceeds withheld from deposit. Most was spent on Angelia, some on a family trip to visit brother Isadore III in Iowa, and the rest on household expenses. The evidence most favorable to the judgment was that Angelia knew the mother would continue to care for her so long as she was in the maternal shelter. Consistently with

discursion of judgment treats them as contemporaneous events.

12. The findings of fact by the trial court, because given without request, are not entitled to our deference. *Prudential Property & Casualty Ins. Co. v. Cole*, 586 S.W.2d 433, 435[4] (Mo. App.1979). Nevertheless, we owe the judgment the most favorable inferences of the evidence. In that perspective, we concur in the insights of the trial judge that Angelia acted quite normally within the family relationship shown by the evidence: her disinclination for

formal educational instruction beyond high school and her awareness of the family needs prompted her gift to the mother of the educational trust fund, and prompted the mother to accept. We agree also with the sense of the trial court comment that the testimony of the mother that she continued to hold the money "in trust," although then in the form of separate accounts, was not intended in the legal idiom but merely to explain that the funds were for the benefit of the family, and not for herself alone.

that commitment, the mother liquidated the joint savings account with Angelia only after the daughter [who had by then reconciled with the father] left the maternal residence with the intention—expressed with vehemence—never to return.

It is essential to a valid gift that the donee accept ownership, immediately and absolutely. To defer the effect of transfer is merely to promise a gift, a transaction without consideration and unenforceable. *Cartall v. St. Louis Union Trust Co.*, 348 Mo. 372, 153 S.W.2d 370, 375[8] (1941). The evidence supports a gift by the beneficiary to the mother unequivocally intended and unequivocally accepted. The law assumes acceptance, moreover, where the purpose of the gift is beneficial, unless the contrary appears. *Jones v. Jones*, 201 S.W. 557, 558 (Mo.App.1918). The evidence sustains a gift prompted by love and affection for the family, given and received unconditionally.

Angelia contends that the proof of the elements of a formal inter vivos gift notwithstanding, the relationships of trustee-beneficiary and parent-child between the donor and donee render the transfer of the fund presumptively invalid, an onus not overcome by clear and convincing evidence. The pleading of the petition alleges a conjunction of circumstances: the fiduciary relation, the gift to the fiduciary by the beneficiary, and the opportunity [from the very relation] for the exercise of undue influence—which raise the presumptive invalidity of the transaction, and so engages the jurisdiction of equity. *Loehr v. Starke*, 332 Mo. 131, 56 S.W.2d 772, 777 (banc 1932);

*Bridwell v. Swank*, 84 Mo. 455, 467 (1884). The bare hypothesis of relation of trust, transfer of gift to the trustee, and the opportunity for influence, however, does not prove the cause of action. There must be some evidence to make a prima facie case of breach of trust or other confidence. *Cuthbert v. Heidsieck*, 364 S.W.2d 583, 587 (Mo.1963). That evidence adduced, the burden of nonpersuasion falls on the trustee [or other confidante] to prove by clear and convincing evidence that the transaction of gift was "fair and equitable in every respect." *Laspy v. Anderson*, 361 S.W.2d 680, 682[2] (Mo.1962); *In re Patterson's Estate*, 383 S.W.2d 735, 738[1, 2] (Mo.1964).

In that regard, the beneficiary argues that the trustee mother failed to rebut by clear and cogent proof the evidence of the daughter that the transfer of the fund was induced by mistake and ignorance of the terms of the trust. The insistent testimony of daughter Angelia was that the existence of the trust fund for her education was never known to her until disclosure by the father in early 1978—almost a year after the trust proceeds were withdrawn by the mother.[13] Indeed, the trustee mother testified that, although she was aware that the federal court decree imposed a trust on the proceeds of judgment for the education of daughter Angelia [as a continuation of the trust purposes of the numerous accounts established by the mother and father, but misused by the father], she neither recalled execution of the trust document formulated by the federal decree nor the precise contents.[14] Thus, the beneficiary contends, the transfer was consummated without infor-

---

**13.** That posture of evidence was not without inherent contradiction, however. The trial testimony by Angelia that she became aware of the existence of the trust for the first time in January of 1978 [after the visit with the father] was impeached by the allegation of the original petition that she knew of the trust in August of 1977. *Jimenez v. Broadway Motors, Inc.*, 445 S.W.2d 315, 317[1, 2] (Mo.1969). Angelia gave other testimony that she knew in March of 1977 the mother opened the three savings accounts—and presumably the owner designations. Although Angelia asserted she did not know the source of the funds, the truth of that statement becomes at least doubtful since the

deposits in the accounts were almost contemporaneous with the liquidation of the trust fund, and since, by her own account, the family financial straits would not allow the cost of continued education for her.

**14.** The testimony of husband Gross was that the wife duly affixed her signature, although the document was not to be found. In rendition of judgment against the beneficiary the trial court charged the trustee [as do we] with knowledge of the duty freely assumed. *Bennett v. Wood*, 258 S.W.2d 660, 661[1, 2] (Mo. 1953).

mation [by either principals] of the formal power and authority conferred upon the trustee, the terms of the trust, and these other particulars:

(1) that the trust prevented the trustee from "appropriation" or revestment of the funds in herself

(2) that the trust was to be used solely for the education of the beneficiary

(3) that the trust was not to terminate until the trustee determined that the education of the beneficiary was complete or that she wished no more, at which time the corpus was to be delivered to the beneficiary

(4) that the trust assets were not worth the $20,000 or so the trustee assumed

(5) that the beneficiary daughter did not know that it was the *father* who established the education fund

(6) that the beneficiary and trustee assumed the trust terminated as a matter of course at the age of eighteen.

That the trustee misconceived one duty under the trust is without doubt. The mother assumed [and by the inference due that evidence—the beneficiary, as well] that at age eighteen the trust was at the unconditional disposition of Angelia. The terms of trust impose no stricture of age, but terminates rather

"when the trustee or successor trustee shall have determined that the beneficiary's education is complete or that she has received all the education that she desires to take, at which time the unused balance of the trust shall be delivered to the beneficiary."

There is no issue, in any event, as to an educational purpose desired by the beneficiary but unfulfilled by the trustee. The petition of the beneficiary pleads completion of her secondary education in high school in June of 1977, the concurrent courses in key punch operation and a six-month stint for instruction as a clerk and

calculator operator.[15] That allegation of petition concludes: "plaintiff did not and does not plan to take any other full or part time formal courses of study at the college level, as defendant [trustee] knew." That assertion of the pleading—in contradiction of the trial and appeals theory of the beneficiary that the gift was an unlawful *appropriation* of the trust funds by the trustee because the educational purpose of the trust remained yet unaccomplished—constitutes a judicial admission. *Greene v. Kelly Enterprises, Inc.*, 561 S.W.2d 725, 726[1] (Mo.App. 1978).

If, nevertheless, the trier of fact was left an issue as to whether, prior to the act of gift, the beneficiary remained open to continued educational instruction, the judgment—which assumes the fact contrary to contention—rests on substantial proof. The evidence that Angelia was expelled from parochial school, that her career at the public high school was troubled, that she rejected every family overture to assist placement at a university, all allow the inference by a clear, cogent and convincing quantum that the educational purpose of the trust was forgone at the time of the gift of the assets. That rationale of judgment dispels also the contention that the adjudication of gift rests on a mistaken notion of law. The beneficiary cites the rule in Restatement (Second) of Trusts § 343 (1959) which recognizes that the transfer of interest by the cestui to the trustee terminates the trust even though the purpose has not been accomplished, unless a term of the trust or a rule of law restrains the beneficiary from a transfer of interest. See also *St. Louis Union Trust Company v. Conant*, 499 S.W.2d 761, 766[7, 8] (Mo.1973)]. The beneficiary cites also the rule in Restatement (Second) of Trusts § 154 (1959) [and our decisions—*Thomson v. Union National Bank in Kansas City*, 291 S.W.2d 178, 183[10] (Mo.1956); *Evans v. Rankin*, 329 Mo. 411, 44 S.W.2d 644, 649[8–10] (1931)]

---

**15.** That instruction at the Pioneer Community College, taken from June of 1977 until January of 1978—and so after the gift in March of 1977—was paid for by the mother. Angelia was enabled to attend classes and her concurrent employment by an automobile purchased inexpensively by the mother. These actions support the sense of the judgment that the gift was given and used for a family purpose.

that a trust for support or education cannot be terminated, even upon consent of the beneficiary, unless the trust purpose be accomplished. Those contentions, one the statement of the principle *simpliciter* and the other, the statement *a fortiori*, are concluded by the fact determination implicit to judgment that the purpose of the trust to educate Angelia to the extent of her inclination or possibility was fulfilled, so that she was entitled to the reversion of the fund altogether.

The evidence favorable to the judgment, by a clear, cogent and convincing quantum, discharges also the onus of the trustee to prove that the gift was consummated, not only within the trust terms, but without inducement of mistaken fact, undue influence or other want of equity, and was altogether fair.

▮ The law expects a trustee to deal fairly with the beneficiary and "to communicate to [the beneficiary] all material facts in connection with the transaction which the trustee knows or should know." Restatement (Second) of Trusts § 170(2) (1959). See also *Bilton v. Lindell Tower Apartments*, 358 Mo. 209, 213 S.W.2d 952, 958[1–3] (1948). The beneficiary argues that the transfer of the trust asset was done without information from the trustee as to the value of the property, or that the father was the benefactor, without the aid of objective advice of legal rights, and otherwise resulted from an undue pressure.

These arguments assume the validity of the beneficiary evidence and discount the effect of the proof made by the trustee and, concomitantly, the deference owed the judgment. Although the trustee did not recall execution of the formal trust instrument, she was always aware of a trust fund and a trust duty. The trustee mother recollected that the federal award was some $10,000 [actually, $10,022.76 less $2,551.30 attorney fee]. The prediction of counsel Roach was that the sum would double by college age, so that when Angelia became of age she was surprised to learn from Waddell and Reed that the investment amounted to only some $7,600. It was the testimony of the trustee that only after she communicated the current value of the investment and her disappointment to Angelia—after which the daughter iterated the declaration of gift—that the mother withdrew the funds from the trust investment. The beneficiary contends also, that another want of information induced the gift: that she was not told by the trustee that it was the father who established the trust fund, but rather she was induced to the largesse by the plaints of the brother that the father "had done her wrong" and of the mother that the father did not provide for her education. That is to say that the mother deserved the gift because she was "the only concerned parent." Once again, the beneficiary argues only the effect of her own evidence. The report of the federal court decision, as we note, clearly states that the original savings accounts trust for the education of Angelia was a device of both parents, but it was the misfeasance of the father which made the litigation necessary to preserve the funds for the daughter. The evidence of neglect of the family needs by the father, moreover, came also from the beneficiary, herself. Those contentions of mistake are refuted by the quantum of proof required by equity.

▮ The beneficiary complains the gift transfer was without the benefit of independent advice, and the evidence of the trustee does not overcome that impediment to fairness. The want of independent and competent advice precedent to a transaction between a beneficiary and trustee merely weighs but does not determine the fairness of such a transaction. *Matter of Estate of Soper*, 598 S.W.2d 528, 538[13] (Mo.App. 1980); 76 Am.Jur.2d Trusts, § 323 (1975). The more preponderant consideration for equity is whether the *trustee* induced the gift by improper means. *Nelson v. Hammett*, 189 S.W.2d 238, 243[9] (Mo.1945).

The beneficiary cites *Newton v. Rebenack*, 90 Mo.App. 650 (1901), and cases of that ilk to show the concern of equity that a beneficiary have access to legal or other competent advice antecedent to a transfer of the trust expectancy to the trustee.

*Newton* was not a case of gift, but a case of transfer for an ostensible consideration. There, the trustee, a *lawyer*, blatantly solicited and acquired the consent of the beneficiary [then barely *sui juris*] to assign to the trustee the trust estate for the purchase of real estate and to take title in his sole name. The terms of assignment also purported to free the real estate so acquired from any equity of the beneficiary. The consideration for the transfer was payment of six percent per annum of the net amount of the trust money in the hands of the trustee. The trust was for the support and education of the beneficiary during her lifetime. The terms of trust defined the method of investment of the corpus and surplus after distribution, breached by the trustee under the assignment, and provided for an annual accounting to the beneficiary, also breached by the trustee. The court set aside the assignment on the principle that, whatever the acquiescence of the beneficiary, equity would not sanction her conduct as an act of confirmation of the transaction because not "done with a knowledge of [her] legal and equitable rights." [*Newton* l.c. 675].

Newton does not serve as a precedent for reasons, among others, that the transfer of the trust fund was brazenly *solicited* for the *personal benefit* of the trustee, that the transfer was induced for a manner of investment prohibited by the trust terms, and by an assignment of the corpus the beneficiary—entitled to only a life benefit—was without power to give. The decisive rationale of opinion, even more, rested on the unequal positions of the principals: the trustee, a lawyer, and the beneficiary barely of age. It was this disadvantage the court denounced: a trustee who by profession knew the legal implications of the trust restrictions and of the assignment he devised against a beneficiary without comparable understanding or advice. Equity does not condemn *per se* the transfer to a trustee of trust property from a beneficiary *sui juris*, but sanctions a transaction open, fair and on informed consent—that is, by persons on a parity of knowledge of material facts and right, and

otherwise free from undue influence. *Hillyard v. Leonard*, 391 S.W.2d 211, 223[7–10] (Mo.1965); *Kuhn v. Zepp*, 355 Mo. 295, 196 S.W.2d 249, 253[5] (Mo. banc 1946); Restatement (Second) of Trusts § 170(2) Comment w (1959).

The gift from Angelia to the mother was free from the initiative of the donee mother, unsolicited, was not a personal benefit nor derived from the advantage of position. We agree with the trial court that to all effect, the mother and daughter were on a parity of knowledge of the trust terms and of the material circumstances. They were also on a parity of misconception, albeit a harmless incidence. The transfer entailed no breach of a trust term [once the educational contingency was fulfilled]. There was no advantage of legal insight to redress as between them. In fact, inquiry by the trustee for advice about the trust terms at the outset of that duty was never answered; the attorney failed to call back as he promised to do. In any event, legal advice could only have informed them that which both the daughter and mother already assumed—once the educational purpose was ended—that the trust was to educate Angelia and, after that, the daughter was entitled to the proceeds to do with the funds as a free will pleased, even to give the money away once she became eighteen years of age. *Newton* does not serve as analogy.

The final contention argues that *undue pressure* by the mother and other family members on the beneficiary, only recently become adult, was an undue inducement for the gift and is entitled to the redress of equity. The beneficiary means by *undue pressure* a suasion induced by argument of moral obligation by other members of the family upon one just come of age. Angelia refers to the family conversations before and after the divorce of the parents concerning financial predicament to the mother and children from that event. Angelia argues that the recurrent entreaty [by now fully related] that the family needed the money and that the mother was the deserving parent imposed an "irresistible pressure" on Angelia to disclaim the expectancy

while still sixteen years of age. The evidence [consistent with the judgment] was, however, that Angelia herself not only shared these family dispositions, but also was the prime mover of the gift and made the donation at the lawful age.

The beneficiary cites *Bradshaw v. Yates*, 67 Mo. 221 (1877), among other authority, to invalidate the transfer from daughter Angelia to the mother. That case, however, was decided on the *undue influence*, not the *undue pressure*, of the parent upon the child to induce a voluntary transfer of property. In that case, the child [by then somewhat past majority but continued to live under the roof of her stepfather and former guardian] was induced to convey her estate as a gift to that stepparent by his *false statements* that at the death of her natural father, the estate was partitioned improperly so as to deprive her mother [also by then deceased] of a just ownership [and himself of that inheritance] and that the conveyance from the child to the stepfather would right that wrong. The court held that the usual relation of confidence between a parent and child persists as to a child recently become *sui juris* who continues under the parental roof, and equity protects that relation against the undue influence of the parent. On fiduciary principle, therefore, the parent bears the onus to prove that the act of the child was that of a free agent and that the transaction of gift was altogether fair. See also *Miller v. Simonds*, 72 Mo. 669 (1880); Annot., Fraud—Deed from Child to Parent, 11 A.L.R. 730 (1921).

The conduct of the stepparent in *Bradshaw* was not only a self-aggrandizement at the expense of the child in other particulars [l.c. 231—"he looked well to his own interests"—"he consumed the personal estate of his ward"], but the gift of her estate was induced not only by an undue influence but, as the court found, by actionable *fraud*. The perverse and willful conduct of the parent in *Bradshaw* simply does not compare with the benign expressions of family concern shared not only by the trustee mother, daughter Julietta and brother Isadore III, but by Angelia, herself.

The mother protected and cared for Angelia, the stepfather in *Bradshaw* deprecated and deceived that child. The *undue influence* which equity corrects is "such overpersuasion, force, coercion, or deception as substitutes the will of another for that of a . . . donor." *Michaelson v. Wolf*, 364 Mo. 356, 261 S.W.2d 918, 925[11–14] (1953). The mere proof of a confidential relation is not enough to prove undue influence; there must be some evidence that the donee was active to induce the gift. *Loehr v. Starke*, 332 Mo. 131, 56 S.W.2d 772, 778[6] (banc 1932); *In re Patterson's Estate*, 383 S.W.2d 735, 738[1, 2] (Mo.1964). Nor is the influence of natural affection an undue influence. *Hahn v. Brueseke*, 348 Mo. 708, 155 S.W.2d 98, 106[8] (1941). The evidence sustains the rationale of judgment: that the trustee mother proved by a clear, cogent and convincing quantum that the gift was transfer of the trust funds—an effusion of natural love and affection, freely and fairly given, uninduced by an improper influence of the mother or family.

The judgment is affirmed.

All concur.